UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HON. GARY S. KATZMANN, JUDGE
_____

|  |  |  |
|---|---|---|
| SOUTHWEST AIRLINES CO., | : | |
| | : | |
| Plaintiff, | : | Court No. 22-00141 |
| | : | |
| v. | : | **NON-CONFIDENTIAL VERSION** |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____:

### <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

April 30, 2024

Adam P. Feinberg
Richard A. Mojica
Miller & Chevalier Chartered
900 16th Street NW
Washington, DC 20006
Phone: (202) 626-5800
Fax: (202) 626-5801
afeinberg@milchev.com
rmojica@milchev.com

*Attorneys for Plaintiff, Southwest Airlines Co.*

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

INTRODUCTION ........................................................................................................... 1

QUESTIONS PRESENTED............................................................................................ 2

STATEMENT OF FACTS ............................................................................................. 3

SUMMARY OF ARGUMENT ..................................................................................... 8

ARGUMENT ................................................................................................................. 9

I.     UNDER THE PLAIN LANGUAGE OF THE STATUTE AND
      REGULATIONS, CBP IS NOT ENTITLED TO A FEE WHEN A
      TICKET IS CANCELLED AND THUS NO PASSENGER ARRIVES IN
      THE UNITED STATES ABOARD A COMMERCIAL AIRCRAFT........................... 10

      A.     The Statute Provides that CBP Is Entitled to a Fee Only If a
              Passenger Arrives in the United States Aboard a Commercial
              Aircraft......................................................................................................... 11

      B.     The Regulation Provides that CBP Is Entitled to a Fee Only If a
              Passenger Arrives in the United States Aboard a Commercial
              Aircraft......................................................................................................... 13

      C.     Defendant's Trust Theory Is Meritless and Cannot Override the
              Plain Language of the Statute and Regulation...................................... 14

II.    THERE IS NO BASIS FOR DEFENDANT'S POSITION THAT AN
      AMOUNT REMAINS A COLLECTED FEE UNLESS IT HAS BEEN
      "REFUNDED" TO THE CUSTOMER............................................................... 16

      A.     Defendant Admits that It Is Possible for Amounts Originally
              Collected as Fees to Cease to be Collected Fees, Even If There is
              No Cash or Cash-Like Refund to the Customer. ................................... 17

      B.     Once a Ticket Has Been Cancelled in Exchange for an RTF, There
              Is No Fee at All, and Certainly Not a Collected One............................ 19

      C.     Defendant's Position Improperly Conflates the Question of
              Whether a Fee Has Been Overpaid with the Question of the Proper
              Procedure to Recover an Overpaid Fee from CBP. ............................. 20

III.   DEFENDANT IS NOT ENTITLED TO FEES IN CONNECTION WITH
      THE ERROR TICKETS BECAUSE SOUTHWEST REFUNDED
      THOSE FEES TO THE CUSTOMERS IN THE FORM OF FLIGHT
      CREDIT. .................................................................................................................. 22

i

A.    As a Legal Matter, Travel Funds, *i.e.*, RTFs, Are Refunds When Issued. ................................................................................................................. 23

B.    As a Factual Matter, RTFs Are Refunds When Issued. ........................................ 27

CONCLUSION ......................................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Aerolineas Argentinas v. United States*,
    77 F.3d 1564 (Fed. Cir. 1996) ........................................................................................9, 10

*American Airlines, Inc. v. United States*,
    551 F.3d 1294 (Fed. Cir. 2008) ......................................................................................12, 13

*Caver v. Cent. Ala. Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) .....................................................................................26, 27

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ............................................................................................................11

*In re Columbia Gas Sys. Inc.*,
    997 F.2d 1039 (3d Cir. 1993) .............................................................................................15

*FAG Italia, S.p.A. v. United States*,
    291 F.3d 806 (Fed. Cir. 2002) ...........................................................................................11

*Louisiana Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986) ............................................................................................................11

*United Airlines, Inc. v. United States*,
    111 F.3d 551 (7th Cir. 1997) .......................................................................................24, 25

*United States v. McConnell*,
    258 B.R. 869 (N.D. Tex. 2001) ....................................................................................15, 16

**Statutes**

8 U.S.C. § 1356 .......................................................................................................................12, 13

19 U.S.C. § 58c ..................................................................................................................... *passim*

21 U.S.C. § 136a ..........................................................................................................................14

26 U.S.C. § 4261 ..............................................................................................................21, 24, 25

26 U.S.C. § 4291 ..........................................................................................................................21

26 U.S.C. § 6415 ..............................................................................................................22, 24, 25

26 U.S.C. § 7501 ....................................................................................................................16, 21

Ala. Code § 37-6-20 .....................................................................................................................26

**Other Authorities**

7 C.F.R. § 354.3 ....................................................................................................................14

19 C.F.R. § 24.22 ............................................................................................................ *passim*

26 C.F.R. § 40.6011(a)-1 ....................................................................................................21

Black's Law Dictionary (11th ed. 2019)..............................................................................23

Ct. Int'l Trade Rule 56.3......................................................................................................3

Fed. R. Civ. P. 30 ........................................................................................................... *passim*

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .........................................15

Rev. Proc. 2011-17, 2011-1 C.B. 441 ..................................................................................25

Rev. Rul. 70-13, 1970-1 C.B. 272 ........................................................................................25

Rev. Rul. 89-109, 1989-2 C.B. 232 .................................................................................25, 26

## INTRODUCTION

Plaintiff Southwest Airlines Co. ("Southwest") brings this action because U.S. Customs and Border Protection ("CBP") has illegally exacted sums from Southwest under the pretense of statutory and regulatory authority relating to the Customs Passenger Processing Fee (the "Fee"). *See* 19 U.S.C. § 58c(a)(5)(A); 19 C.F.R. § 24.22(g).  Generally, the Fee applies to "the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States," is collected by airlines from airline passengers, and is remitted quarterly by the airlines to CBP. 19 U.S.C. § 58c(a)(5)(A); *see also id.* § 58c(d).  The Fee is a true user fee, meant to compensate CBP for providing customs services to international air passengers arriving into the United States.  *See, e.g., id.* § 58c(e).  Yet, in this case, Defendant takes the position that CBP is entitled to Fees even when airline customers cancel their tickets and thus never travel at all.  Under that flawed theory – which is precluded by the statute's plain text – CBP has illegally exacted from Southwest the principal amount of $378,088.26, plus $66,585.13 in interest, all of which Southwest paid to CBP under protest.

CBP generally recognizes that an airline should adjust downward its Fee remittances to CBP to account for tickets that are cancelled and where no passenger travels.  But, Defendant creates a further caveat from whole cloth that is inconsistent with the statute and regulations:  an airline can recover an overpaid Fee from CBP only if the airline "refunds" the Fee to the customer.  In support, Defendant argues that (1) an airline's liability to CBP for a Fee depends on whether the airline "collects" a Fee from the customer and should ignore whether the customer actually travels on a plane, and (2) the only way an airline can avoid paying to CBP an amount originally collected as a Fee is if it is "refunded" to the customer, which Defendant wrongly claims Southwest did not do here.

CBP's Fee assessment against Southwest constitutes an illegal exaction for at least three separate reasons.  First, the applicable statute and regulation unambiguously allow CBP to obtain a Fee only when a passenger arrives on a plane in the United States, which undisputedly did not occur here.  Second, even assuming *arguendo* that CBP is entitled to a Fee *whenever* an airline collects one, Defendant wrongly asserts that the only way an amount can cease to be a collected Fee is if it is "refunded" to the customer.  Instead, there ceases to be a collected Fee once a ticket is cancelled in exchange for flight credit in the total amount of the ticket purchase.  Third, even if that too is wrong, Defendant's theory that flight credit that eventually expires unused cannot qualify as a "refund" is contrary to the law and the facts.  The flight credits at issue here – which, Southwest issued to customers in exchange for their cancelled tickets in accordance with the express terms of the written contract between Southwest and its customers – qualify as refunds regardless of whether they eventually expire unused.  As a result, Southwest is entitled to recover the principal amount of $378,088.26, plus $66,585.13 in interest, both of which CBP illegally exacted from Southwest under protest.

## QUESTIONS PRESENTED

1.      Is CBP authorized by statute to collect Fees in instances where there is no "arrival of {a} passenger aboard a . . . commercial aircraft from a place outside the United States"?  19 U.S.C. § 58c(a)(5)(A).

2.      Does the regulation permit CBP to collect Fees in instances where there is no "arrival of {a} passenger aboard a . . . commercial aircraft from a place outside the United States"?  19 C.F.R. § 24.22(g)(1)(i).

3.      Notwithstanding Issues 1 and 2 above, do funds originally collected by an airline as a Fee retain their character as a Fee once the associated airline ticket is canceled and credit

(including in the form of a flight credit in the total amount of the ticket purchase) is returned to the customer?

    4.      Was CBP correct in refusing to recognize that Southwest's issuance of a flight credit (in the total amount of the ticket purchase) to the customer in exchange for a cancelled ticket is a "refund" even if that flight credit later expires unused?

    Judgment in Southwest's favor is appropriate if any of these four questions is answered in the negative.

## STATEMENT OF FACTS

    The relevant facts and supporting citations are set forth in the accompanying Plaintiff's Rule 56.3 Statement of Undisputed Material Facts ("SUMF"), which is incorporated herein.

    Southwest has more generous refund policies than many other airlines. *See* SUMF ¶¶ 16-17, 27. In accordance with Southwest's written agreement with its customers, *i.e.*, its Contract of Carriage, even so-called "nonrefundable" tickets can be refunded. *Id*. ¶¶ 8-9, 11, 16, 18. Specifically, in the event a customer holding a "nonrefundable" ticket elects not to travel, the ticket is cancelled and Southwest refunds all amounts originally paid as airfare, taxes, the Fee, and other fees in the form of travel credit in the customer's name. *Id*. ¶ 8, 16, 18. Southwest internally refers to such travel credit as a "Residual Travel Fund" or "RTF." *Id*. ¶ 8. An RTF is an electronic credit that the customer may elect to use to purchase future travel on Southwest. *Id*. ¶¶ 6-7. As further provided in the Contract of Carriage, if the customer elects not to use the RTF for future travel within the eligibility period (which was one year during the period at issue), the entire amount of the RTF is forfeited to Southwest. *Id*. ¶¶ 8, 11, 34.

[

]

Southwest and its customers consider RTFs to be a form of refund.  *Id*. ¶¶ 20-27.  RTFs are reflected as "refunds" in Southwest's internal records.  *Id*. ¶ 23.  Likewise, Southwest's Contract of Carriage treats RTFs as refunds.  *Id*. ¶ 22; *see also id*. ¶ 8.  When Southwest sends an e-mail to a customer who cancels a ticket in exchange for an RTF, the e-mail refers to the RTF as the refund for the cancelled ticket.  *Id*. ¶ 24.  And, a Forbes article and one of CBP's own auditors both referred to RTFs as "refunds."  *Id*. ¶¶ 27-28.  When a ticket is cancelled and an RTF is issued to the customer in exchange, all of the accounting entries associated with the original sale of the ticket are reversed and no airfare, taxes, or Fees are identified in the RTF (nor are the funds at issue identified elsewhere in Southwest's records as airfare, taxes, or Fees).  *Id*. ¶¶ 31-33.  All that exists is a single liability to the customer in the form of the RTF.  *Id*. ¶ 32; *see also id*. ¶ 6.

Whenever a ticket is cancelled and refunded – either in the form a refund to the customer's method of payment (which is typically a credit card) or in the form of an RTF – Southwest reduces the amount it will pay to CBP in its next Fee remittance to account for the cancelled ticket.  *Id*. ¶ 31.  That is the normal process for accounting for Fees overpaid to CBP.  *Id*. ¶¶ 35-36.  If a customer uses an RTF to purchase a ticket to which the Fee applies, Southwest will collect the Fee from the RTF and remit it to CBP.  *Id*. ¶¶ 6, 29.

In 2017, CBP audited Southwest's Fee compliance (the "Audit").  *Id*. ¶ 37.  On November 12, 2019, CBP issued a "User Fee Audit Report" resulting from the Audit (the "Audit Report").  *Id*. ¶ 39.  As reflected in the Audit Report, Southwest remitted approximately [

NON-CONFIDENTIAL

] in Fees to CBP for the period covered by the Audit. *Id.* ¶ 40. In the relevant portion of the Audit, CBP used a sampling methodology by reviewing 100 "nonrefundable" tickets from a pool of tickets identified by Southwest as cancelled and thus where the customer never flew on a plane. *Id.* ¶ 41. Those 100 tickets are referred to herein as the "Audit Sample."

For 12 of the 100 tickets in the Audit Sample, Southwest refunded the entire amount originally paid for the ticket (including the amount originally paid as airfare, taxes, and user fees such as the Fee) to the purchaser's credit card. *Id.* ¶ 45. For the other 88 tickets, Southwest issued the ticketed customer a RTF for the cancelled ticket. *Id.* ¶ 42. Southwest issued these RTFs pursuant to the applicable provisions of the Contract of Carriage. *Id.* ¶ 44. Each RTF issued for the these 88 cancelled tickets was issued in the total amount of money the customer paid for the ticket (including airfare, taxes, and user fees such as the Fee) and had a specified "eligibility period," *i.e.*, expiration date, which was generally one year from the date the cancelled ticket was purchased.[1] *Id.* ¶ 43.

Of those 88 tickets, RTFs for 21 of them eventually expired completely unused. *Id.* ¶ 46. These 21 tickets are referred to herein as the "Error Tickets." Because the tickets were cancelled, no individual flew on a plane in connection with any of the Error Tickets. *Id.* ¶ 47. Nor did CBP provide any "customs services" (as that term is used in 19 U.S.C. § 58c(a) and (e)) in connection with any of the Error Tickets. *Id.* ¶ 48. None of the customers on the Error Tickets requested a refund of the Fee to their original form of payment. *Id.* ¶ 49.

In accordance with Southwest's normal practice, once a ticket in the Audit Sample was cancelled and Southwest either refunded the amount paid for the ticket to the purchaser's credit card or issued the RTF to the individual in whose name the ticket was issued, Southwest claimed

---

[1] Currently, RTFs do not expire. *Id.* ¶ 10.

a credit for the amount of the Fee on a future Fee remittance to CBP, if Southwest had previously remitted such amount to CBP. *Id*. ¶ 50. If Southwest had not already remitted the amount of the Fee to CBP at the time one of the tickets in the Audit Sample was cancelled, Southwest similarly claimed a credit, and since that credit and the original Fee collection occurred in the same quarterly remittance period, the result was that Southwest did not include such amount in any future Fee remittances to CBP. *Id*.

When the RTFs issued for the Error Tickets expired, Southwest retained the funds the customer originally paid (including the amount originally paid as airfare, taxes, and user fees such as the Fee), as expressly called for in Southwest's Contract of Carriage. *Id*. ¶¶ 8, 51, 55.

In the Audit, CBP found the 21 Error Tickets (out of the 100 tickets in the Audit Sample) to be "errors" because they involved instances where no cash refund or credit card adjustment was provided to the customer and "the passenger did not use the non-refundable purchased ticket and was issued an RTF by Southwest that went unused and eventually expired." *Id*. ¶ 52.

In the Audit, CBP extrapolated the 21 Error Tickets over Southwest's total Fee remittances to compute an underpayment of $378,118.13 attributable to the Error Tickets. *Id*. ¶ 57. CBP also determined that Southwest over-remitted $29.87 associated with tickets cancelled in exchange for an RTF, leaving a total purported underpayment of $378,088.26 associated with that category of tickets. *Id*.

For the remaining 67 of the 88 cancelled tickets for which RTFs were issued, the customer wholly or partially used the RTF. *Id*. ¶ 58. CBP did not identify as "errors" any of those 67 tickets. *Id*. CBP did not identify as "errors" any tickets other than the 21 Error Tickets. *Id*.

Separately, in the Audit, CBP also determined that Southwest had over-remitted $6.50 in Fees associated with a different category of tickets. *Id.* ¶ 59.

Based on the Audit, on November 20, 2019, CBP issued an assessment against Southwest in the principal amount of $378,081.76, representing the aforementioned purported underpayment of $378,088.26 associated with tickets cancelled in exchange for an RTF, minus the aforementioned over-remitted $6.50 in Fees associated with a different category of tickets. *Id.* ¶ 60. Then on February 18, 2020, CBP issued an assessment against Southwest for an additional $66,585.13 in interest on the principal amount. *Id.* ¶ 62. We refer to these two assessments collectively as the "Assessment." Southwest paid the $378,081.76 principal portion of the Assessment to CBP under protest on January 6, 2020, and paid the $66,585.13 interest portion of the Assessment to CBP under protest on March 4, 2020. *Id.* ¶¶ 61, 63.

The entirety of the principal portion of the Assessment represents Fees on cancelled tickets that CBP contends Southwest should have either paid to CBP or refunded to the customer. *Id.* ¶ 60. The Assessment is based solely on instances where CBP determined that Southwest customers (1) elected not to travel on their "nonrefundable" international tickets (and thus, did not use or receive any customs services), (2) received an RTF pursuant to the applicable Contract of Carriage provisions, and (3) did not subsequently use the RTF for future travel prior to the RTF's expiration. *Id.* ¶¶ 41-42, 44, 47-48, 52, 55, 60. Defendant concedes that had the RTF actually been used by the customer for a new flight (regardless of whether the Fee applied to the new ticket), it would have qualified as a "refund" and thus CBP would not have been entitled to any Fee. *Id.* ¶ 73. CBP's theory is that it is impossible to tell whether an RTF is a valid refund until it is either used or expires. *Id.* ¶ 72.

On May 13, 2020, Southwest timely filed a formal protest (the "Protest") of the

Assessment, and CBP denied the Protest on November 9, 2021 (the "Protest Denial"). *Id.* ¶¶ 64,

66. In both the Audit and the Protest Denial, CBP relied on a short October 28, 2010 letter that

CBP sent to an airline trade association called the International Air Transport Association (the

"2010 CBP Letter"). *Id.* ¶ 68. The 2010 CBP Letter states: "To the extent user fees are collected

on behalf of CBP for unused tickets and such fees are not refunded to purchasers, the user fees

are considered to be held in trust for the United States and must still be remitted, without credit,

to CBP." *Id.* ¶ 69. Defendant does not contend the 2010 CBP Letter is entitled to any sort of

deference in this case and has expressly waived any such argument. *Id.* ¶ 70.

## SUMMARY OF ARGUMENT

CBP's Assessment constitutes an illegal exaction against Southwest for at least three

independent reasons. *First*, the statutes and regulations are clear that CBP is entitled to a Fee

only when there is an "arrival of {a} passenger aboard a . . . commercial aircraft from a place

outside the United States," 19 U.S.C. § 58c(a)(5)(A); 19 C.F.R. § 24.22(g)(1)(i), which did not

occur in this case. "Fees may be charged . . . only with respect to customs services rendered in

regard to arriving passengers using transportation for which documents or tickets were issued

after the date that is 90 days after April 7, 1986." 19 U.S.C. § 58c(j)(2). Because there were no

"customs services rendered in regard to arriving passengers using transportation," CBP cannot be

entitled to any Fees here.

Defendant's theory that the Fees at issue here are somehow protected by a constructive

trust is a red herring and cannot override the statute's plain meaning. Even if a trust could ever

exist as to Fees (which is far from clear), the trust could at most apply to amounts that are

actually Fees that are owed to CBP in the first place. Because the amounts here are not owed to

CBP, any trust that might apply to Fees is irrelevant.

8

*Second*, assuming *arguendo* the correctness of Defendant's theory that CBP is owed a Fee whenever an airline "collects" a Fee regardless of whether the customer travelled on a plane, Defendant is wrong when it asserts that the only way an amount loses its character as a Fee is if it is "refunded" to the customer. Instead, there ceases to be a collected Fee once a ticket is cancelled in exchange for flight credit (regardless of whether that flight credit qualifies as a refund), which is exactly what is contemplated by Southwest's Contract of Carriage with its customers.

*Third*, even if CBP were entitled to a Fee on a cancelled ticket unless the airline "refunds" the Fee to the customer, Southwest did just that when it issued refunds in the form of travel credits, *i.e.*, RTFs, to the customers. Numerous authorities hold that credit qualifies as a refund and, CBP has never been able to muster a rebuttal. As a factual matter too, RTFs qualify as refunds. Perhaps most importantly, the Contract of Carriage that constitutes the agreement between Southwest and its customers treats RTFs as refunds and explicitly calls for RTFs to be the form of refund for "nonrefundable" tickets.

## **ARGUMENT**

Southwest sued Defendant because CBP illegally exacted $444,673.39 via the Assessment. *See* Am. Compl. ¶¶ 2, 7-8. In *Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996), the Federal Circuit explained that:

> {A}n illegal exaction claim may be maintained when the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.

*Id*. at 1572-73 (cleaned up).  As discussed in more detail in the following sections, CBP's

Assessment constitutes an illegal exaction for at least three separate reasons.[2]

## I.  UNDER THE PLAIN LANGUAGE OF THE STATUTE AND REGULATIONS, CBP IS NOT ENTITLED TO A FEE WHEN A TICKET IS CANCELLED AND THUS NO PASSENGER ARRIVES IN THE UNITED STATES ABOARD A COMMERCIAL AIRCRAFT.

The Fee is governed by 19 U.S.C. § 58c.  That statute is clear that the Fee applies only

when a passenger actually travels on a plane.  As relevant here, the statute provides that CBP

"shall charge and collect the following fees . . . for the provision of customs services in

connection with the following: . . . for the arrival of each passenger aboard a . . . commercial

aircraft from a place outside the United States."  19 U.S.C. § 58c(a)(5)(A).

It is undisputed that the Assessment is premised entirely on tickets that were cancelled,

where no passenger flew on a plane, and where no customs services were rendered by CBP (or

any other government agency).  Despite that, Defendant still contends that CBP is entitled a Fee

for each of the cancelled Error Tickets.  As articulated in the Protest Denial, CBP's theory is

premised on statutory provisions that CBP says create "two interlocking requirements:  (1) that

an air carrier collect {Fees} from passengers 'at the time the {document or} ticket is issued,' and

(2) that the entity collecting the fees 'shall remit *those fees* to the Secretary of the Treasury'

within a specified time frame."  ECF No. 14-1 at ECF p. 131 (quoting 19 U.S.C. § 58c(d)(1)(A),

(d)(3)).  In other words, CBP contends that its entitlement to a Fee turns on whether the airline

had "collect{ed}" a Fee, not on whether a passenger travels and receives customs services from

---

[2] Southwest also alleges that there is a fourth reason the Assessment cannot stand:  Defendant failed to give Southwest fair notice of Defendant's interpretation that Fee refunds must be given to customers whose tickets are cancelled and that flight credit that later expires unused does not qualify as a refund.  *See* Am. Compl. ¶¶ 9, 54.  That argument is not the subject of this motion, but Southwest reserves its right to raise it in this case at a later time.

CBP. Defendant's reading should be rejected because the statute and the regulations are clear that CBP is entitled to a Fee only if a passenger arrives on a plane into the United States.

### A. The Statute Provides that CBP Is Entitled to a Fee Only If a Passenger Arrives in the United States Aboard a Commercial Aircraft.

Defendant's reading – that any collected Fee must be remitted to CBP regardless of whether there is a travelling passenger – is flatly contradicted by the statute. As stated above, CBP "shall charge and collect the following fees . . . for the provision of customs services in connection with the following: . . . for the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a)(5)(A). "Agencies are creatures of Congress; 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). That Congressional authority must be express and "the absence of a statutory prohibition cannot be the source of agency authority." *FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002). "The fact that {an agency} is empowered to take action in certain limited situations does not mean that {it} enjoys such power in other instances." *Id*. at 817. Thus, CBP has no authority to "charge and collect" fees in connection with commercial airline passengers in any instances except those specified in the statute, *i.e.*, only when a passenger on a commercial aircraft arrives in the United States. *See* 19 U.S.C. § 58c(a)(5)(A). Although CBP took a contrary position in the 2010 CBP Letter, Defendant does not contend the letter is entitled to any sort of deference in this case and has expressly waived any such argument. SUMF ¶ 70.

Defendant's reading of the statute is also expressly precluded by 19 U.S.C. § 58c(j)(2), which states: "Fees may be charged under subsection (a)(5) only with respect to customs services rendered in regard to arriving passengers using transportation for which documents or

tickets were issued after the date that is 90 days after April 7, 1986." If there are no "customs services rendered in regard to arriving passengers using transportation," then CBP is not entitled to a Fee.

Meanwhile, the provisions on which Defendant relies – 19 U.S.C. § 58c(d)(1)(A) and (d)(3) – are administrative procedures for collection of the Fee. They were not intended to define the circumstances in which a Fee would be owed in the first place. The imposition of the Fee in the first instance is defined by 19 U.S.C. § 58c(a), which plainly states that the Fee applies only when a passenger arrives in the United States on a plane. *See also* 19 U.S.C. § 58c(j)(2). Nor do the provisions on which Defendant relies contemplate the scenario at issue here, where a customer purchases a ticket but later cancels it without ever flying on the plane.

In the Protest Denial, CBP cited *American Airlines, Inc. v. United States*, 551 F.3d 1294 (Fed. Cir. 2008), in support of its statutory interpretation. *See* ECF No. 14-1 at ECF p. 131. If anything, that case undermines Defendant's argument. In *American Airlines*, the Federal Circuit analyzed two passenger user fees, including a similar immigration user fee under 8 U.S.C. § 1356. But unlike here, the sole statutory issue in *American Airlines* was whether the airline was liable for fees it never collected in the first place. Referring to a provision similar to 19 U.S.C. § 58c(d)(3), the court noted that "{t}he words 'those fees' plainly refer to the fees collected under paragraph (1) or (2), not a theoretical total of all fees for all passengers whether or not collected," and thus held that the airline had to first collect the fees in order to be liable for them. 551 F.3d at 1300. While the Court's holding certainly establishes that collecting a fee is a necessary condition for liability, it cannot reasonably be read to deem an airline liable for *all* fees it collects, regardless of circumstance, including if the customer ends up not traveling.

To the contrary, the court's opinion is replete with indications that the immigration user fee can apply only when an actual passenger arrives in the United States and receives immigration inspection services. The court stated that the fee is "imposed on persons entering the United States." *Id*. at 1296. The court described a statutory provision similar to 19 U.S.C. § 58c(a)(5)(A) as requiring "that each passenger entering the United States on a commercial carrier shall pay a fee for immigration inspection." *Id*. (citing 8 U.S.C. § 1356(d)). The court also explained that the fee is "based on the principle that government services should be paid for by the users of the services" and thus the "fees {are} imposed on the users of certain services to cover the cost of providing those services." *Id*. at 1296, 1306. These passages undermine Defendant's theory that *American Airlines* supports the notion that CBP is entitled to a Fee even if there is no passenger and no services rendered by the agency.

In sum, the statute is clear: CBP is entitled to a Fee only when a passenger arrives in the United States on a plane.

### B. The Regulation Provides that CBP Is Entitled to a Fee Only If a Passenger Arrives in the United States Aboard a Commercial Aircraft.

Defendant's statutory interpretation is also inconsistent with the applicable regulation, 19 C.F.R. § 24.22(g). That regulation requires air carriers to "collect{} from the passenger the applicable fee specified in paragraph (g)(1)," and to pay to CBP "the fees *required to be collected* under paragraph (g)(1)" – not the fees actually collected – and to pay such fees to CBP "no later than 31 days after the close of the calendar quarter in which the fees *were required to be collected from the passenger*." 19 C.F.R. § 24.22(g)(4)(i), (g)(5) (emphasis added). In turn, paragraph (g)(1) states that the Fee "must be collected and remitted to CBP for services provided in connection with the arrival of each passenger aboard a . . . commercial aircraft from a place

outside the United States." *Id*. § 24.22(g)(1)(i) (emphasis added).[3]  The regulation defines

"passenger" as "a natural person for whom transportation is provided."  *Id*. § 24.22(g)(1)(v).

Thus, the regulation is clear that if, as here, there is no "passenger" who is transported, then no

Fee was "required to be collected under paragraph (g)(1)," *id*. § 24.22(g)(5), and thus no Fee is

owed to CBP.

### C. Defendant's Trust Theory Is Meritless and Cannot Override the Plain Language of the Statute and Regulation.

In the Protest Denial, CBP argued that "{a}fter a {Fee} is collected from a passenger but

before it is remitted to the government, it is CBP's position that such a fee is held in constructive

trust until the fee is remitted {to CBP} or refunded to the customer."[4]  ECF No. 14-1 at ECF p.

131.  For that proposition the Protest Denial cites the 2010 CBP Letter, which takes the same

position.[5]  *Id*. at ECF p. 82.  That argument is meritless for several reasons.

Most fundamentally, even if a trust could ever exist as to a Fee (which is far from clear),

it could not override the statute and regulation so as to create CBP's entitlement to funds where

no such entitlement otherwise exists.  Said another way, at most, a trust would provide protection

for funds in which CBP were entitled to maintain an equitable interest, but is not a mechanism

for determining whether CBP holds or maintains such an interest in the funds in the first place.

---

[3] The title of the regulation is "Fee for arrival of passengers aboard . . . commercial aircraft."  19 C.F.R. § 24.22(g).

[4] In the Audit Report (ECF No. 14-1 at ECF p. 45), CBP relied on a supposed express trust under 7 C.F.R. § 354.3(f)(4)(c).  That regulation applies only to a different passenger user fee called the "AQI user fee" that is administered by the Animal and Plant Health Inspection Service of the U.S. Department of Agriculture.  That fee is governed by 21 U.S.C. § 136a and 7 C.F.R. § 354.3(f), and has no connection to the Fee at issue here.

[5] Again, Defendant does not contend the 2010 CBP Letter is entitled to any sort of deference in this case and has expressly waived any such argument.  SUMF ¶ 70.

Under "the classic definition of a trust," "the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee." *In re Columbia Gas Systems Inc.*, 997 F.2d 1039, 1059 (3d Cir. 1993) (citations omitted). Here, CBP has no equitable (or any other) interest in the funds, because the tickets were cancelled, there were no "passengers," and CBP did not perform any customs services. Indeed, CBP implicitly concedes that it is not the true beneficiary of the funds when it recognizes that it would have been equally acceptable to CBP for Southwest to give the funds to the customers instead of to CBP.[6]

   *In re Columbia Gas Systems* offers an example of a constructive trust from the legislative history of the bankruptcy code:

> Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, *the payment would actually be held in constructive trust for the person to whom the bill was owed.*

*Id.* (quoting H.R. Rep. No. 95-595, at 368 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6324). Because there is no "incurred {customs inspection} bills" or other amount earned by CBP, there can be no constructive trust in its favor.

   The sole case cited in the Protest Denial on the trust issue – *United States v. McConnell*, 258 B.R. 869 (N.D. Tex. 2001) – does not address the key question here. That case held that a constructive trust existed over immigration user fees such that the fees were not part of a bankruptcy estate. The case did not involve a situation where tickets were cancelled and no

---

[6] Whether a constructive trust exists in the *customers' favor* is not a question before the court. Nonetheless, the answer to that question is undoubtedly "no," because Southwest and the customers have an express written agreement (the Contract of Carriage) governing the treatment and ownership of the funds throughout the process and that agreement was followed here.

passengers flew on a plane.  Under the facts of *McConnell*, the court was concerned that, without a trust, "Congress's objective of having monies collected in order to pay for the inspection of passengers would . . . be subverted."  *Id*. at 873; *see also id*. ("If some portion of user fees collected are not available to fund immigration inspections, due to bankruptcy of the debtor, the treasury will be affected.").  That concern is not present here, because there is no possibility of CBP having to perform customs services for which it will not be paid.

Although CBP's lack of entitlement to the funds under the statute and regulation are dispositive of Defendant's trust argument, there are other reasons the argument fails.  Congress knows how to impose a trust when a private party is charged with collecting taxes or user fees from customers and remitting them to the government, *see, e.g.*, 26 U.S.C. § 7501(a), but did not do so here.  Other than the district court decision in *McConnell*, the Protest Denial cites no authority supporting the existence of a trust over amounts originally collected as user fees, and certainly none that would continue in perpetuity, irrespective of flight cancelation and issuance of flight credit to the customer.  Separately, even if a constructive trust could exist as to Fees generally, CBP made no effort to demonstrate that the elements of such a trust are met under the unique circumstances of this case.

## II.    THERE IS NO BASIS FOR DEFENDANT'S POSITION THAT AN AMOUNT REMAINS A COLLECTED FEE UNLESS IT HAS BEEN "REFUNDED" TO THE CUSTOMER.

Defendant's statutory interpretation has a second fundamental problem.  Assuming *arguendo* that Defendant were correct that, so long as there is a collected Fee, CBP is entitled to that Fee even when there is no passenger arriving in the United States (and that assumption is not correct), the collected Fee ceases to be such once the ticket is cancelled and the Fee amount is fully returned to the customer as an RTF, regardless of whether the RTF is a "refund."  CBP has no authority to dictate the form in which Southwest returns funds to its customers.

As noted above, Defendant's theory is that the statute requires the remittance to CBP of "those fees," 19 U.S.C. § 58c(d)(3), with "those fees" referring to amounts an airline "collect{s}" as "the fee charged under subsection (a)(5)," *id*. § 58c(d)(1)(A). Thus, even under Defendant's reading, there must be a "fee" that is "collect{ed}." Here, the cancellation of the ticket in exchange for an RTF and the associated financial transactions mean there is no longer a Fee at all, and certainly not a collected Fee, regardless of whether the RTF qualified as a "refund."

### A. Defendant Admits that It Is Possible for Amounts Originally Collected as Fees to Cease to be Collected Fees, Even If There is No Cash or Cash-Like Refund to the Customer.

Defendant acknowledges that an amount originally collected as a Fee can later lose its character as such, meaning CBP is not entitled to it. For example, Defendant admits that CBP is not entitled to a Fee if a Fee-qualifying ticket is not used for transportation and the Fee is "refunded" to the customer. Def.'s Objs. & Resps. to Pl.'s First Set of Reqs. for Admis. ("Def.'s RFA Response") (Ex. 5 to SUMF) at 2 (Req. No. 5); *see also* ECF No. 14-1 at 82. Defendant also admits that CBP is not entitled to a Fee on a Fee-qualifying ticket if (1) the ticket is not used for transportation, (2) the airline issues the customer an RTF that includes the Fee amount, and (3) the customer uses the entire RTF to purchase a new flight.[7] Def.'s RFA Response at 3, 4 (Request Nos. 7, 10). Tellingly, CBP admits that no Fee is owed even where the new ticket is for entirely domestic travel to which no Fee applies and thus no Fee is ever remitted to CBP. *Id.*

---

[7] In the Audit, CBP found no "error" where an RTF was only partially used, even if the remaining part of the RTF expired unused. SUMF ¶ 58. One of CBP's Rule 30(b)(6) designees explained that so long as the portion of the RTF that was used exceeded the amount of the $5.50 Fee, the value of the Fee had been returned to the customer. *See* Hightower Dep. (Ex. 7 to SUMF) at 70:7-71:12, 75:2-10. It appears Defendant takes a slightly different position in this litigation.

In short, CBP's theory is that, regardless of whether a cash or cash-like refund has been given, no Fee is owed on a Fee-qualifying ticket that is not used for transportation so long as something of value has been given to and utilized by the customer.  *See* Ingalls Dep. (Ex. 4 to SUMF) at 65:25-66:3 (CBP is not entitled to a Fee where the airline "gave the passenger all of their money back via credit, and he used that credit as if he were putting down cash because he realized it" by purchasing a new ticket); *see also id.* at 80:20-81:5 (CBP not entitled to a Fee where the airline refunded the customer in cash or gave the customer "some sort of value or credit that they actually used" to purchase another flight).

As an initial matter, even CBP's admissions are inconsistent with Defendant's basic statutory interpretation.  The Protest Denial asserts that the statute means "that Southwest must transmit to CBP *all* {Fees} collected from its customers on behalf of CBP."  ECF No. 14-1 at ECF p. 130 (emphasis added).  Under Defendant's logic, the supposed statutory requirement that all collected Fees be remitted to CBP contains no exception for a Fee collected from a customer who, for example, later cancels the ticket and receives a cash refund or an RTF that is used to purchase a new ticket.

Moreover, Defendant offers no statutory or regulatory reason or authority that allows CBP to dictate that a "refund" (however that term might be defined) to the customer is the only thing that can avoid liability to CBP for an amount that was previously collected as Fee.  In contrast, Southwest's position is rooted in both statue and regulation.  If the obligation is on the "person that issues a document or ticket . . . for transportation" to collect the Fee "at the time the document or ticket is issued," 19 U.S.C. § 58c(d)(1)(A), liability to CBP for the Fee necessarily terminates as soon as that document or ticket is cancelled and no longer exists.  CBP similarly fails to explain why a customer's election to use a credit or let it expire negates the fact that

Southwest gave the customer something of value at the moment the credit was issued, thereby eliminating any potential liability to CBP for the Fee.

### B. Once a Ticket Has Been Cancelled in Exchange for an RTF, There Is No Fee at All, and Certainly Not a Collected One.

Once the ticket is cancelled, all of the components of the purchase price – the airfare, taxes, and the Fee – cease to exist. SUMF ¶¶ 31-33. Instead, at the time the ticket is cancelled, those transactions are reversed and all that remains is a single, non-denominated liability in the customer's favor in the form of the RTF. *Id*. The customer receives something of value at the time the RTF was issued, even if the RTF later expires based on the customer's inaction. That is no different than the customer receiving a refund for a Fee-qualifying ticket in the form of a check but then failing to ever cash the check – a situation for which one of CBP's Rule 30(b)(6) designees acknowledged CBP is not entitled to a Fee. *See* Ingalls Dep. at 111:23-112:2, 112:17-24.

Meanwhile, Defendant's view forces it to take the position – both in the Audit and as its "official position generally" – that the "determination as to whether an RTF constitutes a refund of any collected passenger user fees cannot be made until the RTF either expires unused or is used to purchase new air transportation." SUMF ¶ 72. That view is illogical, especially since RTFs no longer expire, meaning it could take years or decades to determine under CBP's theory whether a particular RTF qualifies as a sufficient return of value to the customer. Moreover, as noted above, Defendant's position is factually wrong because an RTF is a thing of value as soon as it is issued.

Separately, once a ticket is cancelled, there is longer any "document or ticket . . . for transportation by a . . . commercial aircraft into the customs territory of the United States," 19 U.S.C. § 58c(d)(1), and thus there cannot be any Fee at all. For these reasons, once a ticket has

been cancelled in exchange for an RTF, there is no collected Fee over which CBP can possibly claim any authority or entitlement.

C.    **Defendant's Position Improperly Conflates the Question of Whether a Fee Has Been Overpaid with the Question of the Proper Procedure to Recover an Overpaid Fee from CBP.**

Defendant argues that "{i}f a refund {to the customer} does not occur, there is no 'overpayment' to the Government." Def.'s Objs. & Resps. to Pl.'s First Set of Interrogs. ("Def.'s Interrog. Responses") (Ex. 6 to SUMF) at 4 (Interrog. Resp. No. 4). That position improperly conflates two issues: (1) whether CBP was overpaid, and (2) the proper mechanism to remedy such an overpayment. The first question is addressed in Argument section I. above: CBP is overpaid anytime it receives a Fee but there is no air passenger who arrives in the United States. On that question, even one of CBP's Rule 30(b)(6) designees admits that if an airline paid a Fee to CBP but the "passenger didn't fly," the airline has "paid for something that wasn't due, owed or due, so it's an overpayment." Ingalls Dep. at 46:2-5; *see also id.* at 45:12-19 (there is an "overpayment" if "the passenger doesn't fly, didn't get inspected" but "a fee had been paid to CBP for that instance," "because the airline has paid us {CBP} something that isn't due because the inspection didn't occur").

The second question relates to the mechanism to remedy an overpayment to CBP. The statute does not address that issue, but the regulation does. The regulation provides only one way to remedy an overpayment to CBP: "{o}verpayments" can be recovered from CBP via an "adjustment of{} the next due quarterly payment to CBP" by "the party required to collect the fee." 19 C.F.R. § 24.22(g)(5); *see also* Ingalls Dep. at 41:2-44:16 (under § 24.22(g)(5), an airline can take a credit for Fees paid to CBP for tickets where the passenger did not travel). In other words, Southwest – not the customer – is the only one eligible to recover overpayments directly from CBP. The ultimate disposition of the funds between Southwest and its customer

following ticket cancelation is solely a matter of contract between those parties, and CBP has no authority to reach into that privately ordered agreement.

Defendant nonetheless claims that an airline must return, *i.e.*, "refund," the funds initially collected as a Fee to the customer *in cash (or something similar)* despite an express contractual provision to the contrary. As one of CBP's Rule 30(b)(6) designees put it: "if the passenger didn't travel, CBP doesn't get to keep the money because the passenger didn't travel. The airline then has to give that money back to the passenger because . . . that was money collected on behalf of the U.S. government." Ingalls Dep. at 40:14-24; *see also id.* at 44:17-45:7. While Southwest certainly agrees with the first sentence, there is no basis in the law for the second. No statute or regulation requires that an airline "give { } money back to the passenger," much less dictates the form in which the funds supposedly have to be given back. Further, even assuming an airline were required to give the funds to the customer and to do so in a particular way, there is nothing in the law that allows CBP to keep the funds in the event the airline does not do that.

A comparison of the law applicable here with the law applicable to the federal excise tax on air transportation under 26 U.S.C. § 4261 helps demonstrate how CBP has exceeded its authority in this case. As with the Fee, airlines collect the § 4261 excise tax from customers and remit it to the government using a quarterly return. *See* 26 U.S.C. §§ 4261(d), 4291; 26 C.F.R. § 40.6011(a)-1(a). Under an express statutory provision, any tax an airline collects from customers is held in trust for the United States until remitted to the government. 26 U.S.C. § 7501(a). As mentioned above, as to the Fee, no such express trust exists at all, and even if one did, it could apply only to amounts properly qualifying as Fees because there was a passenger who arrived on a plane into the United States. The excise tax rules also establish a process for the collector (*i.e.*, the airline) to recover overpayments from the government, including by taking

a credit on an upcoming remittance. *See* 26 U.S.C. § 6415(a), (b). As discussed above, that is similar to how Fee overpayments are remedied.

However, unlike 19 C.F.R. § 24.22(g)(5), the excise tax laws impose express conditions on an airline's ability to recover an overpayment. Specifically, {c}redit or refund of any overpayment of tax . . . may be allowed to the person who collected the tax and paid it to the Secretary if such person . . . *has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund.*" *Id.* § 6415(a) (emphasis added).[8] Defendant's position here seeks to graft onto 19 C.F.R. § 24.22(g)(5) a portion of 26 U.S.C. § 6415(a), *i.e.*, the first condition in § 6415(a) relating to repayment of the tax to the customer. There is no basis for Defendant to apply § 6415(a) here at all, much less a basis for Defendant to apply only a portion of that section while ignoring the alternative condition that an airline can also recover the overpayment if it obtains the consent of the customer.

For these reasons, assuming *arguendo* that CBP is owed a Fee whenever an airline "collects" a Fee without regard to whether the customer travelled on a plane, once the Error Tickets were cancelled in exchange for an RTF, value was returned to the customer and there were no longer any Fees in which CBP could claim any interest.

## III. DEFENDANT IS NOT ENTITLED TO FEES IN CONNECTION WITH THE ERROR TICKETS BECAUSE SOUTHWEST REFUNDED THOSE FEES TO THE CUSTOMERS IN THE FORM OF FLIGHT CREDIT.

Even if the statute and regulations permit CBP to receive a Fee when there is no passenger and thus CBP has rendered no customs services (they do not), and even assuming the

---

[8] Notably, as discussed in Argument section III below, the IRS has ruled that flight credit qualifies as a "refund" for purposes of § 6415.

only way an amount can cease to be a collected Fee is if it is "refunded" to the customer (it is not), summary judgment should still be granted in Southwest's favor because RTFs are refunds as soon as they are issued and regardless of whether they later expire unused. As alluded to above, Defendant admits that "{n}o Fee is owed to CBP (or if a Fee has already been paid to CBP, the air carrier is entitled to deduct the Fee from its next quarterly Fee remittance to CBP) if a ticket for transportation to which the Fee would have applied is not used for transportation and the air carrier has refunded the Fee to the customer{}." Def.'s RFA Response at 2 (Req. No. 5); *see also* ECF No. 14-1 at 82. Thus, the only remaining question on this front is whether RTFs are refunds even if they eventually expire unused. They are.

### A.    As a Legal Matter, Travel Funds, *i.e.*, RTFs, Are Refunds When Issued.

Defendant acknowledges that "CBP has not formally adopted a definition of the term 'refund' as applied to commercial carriers and the Fee, but it contends that an expired RTF does not fall within the plain, ordinary meaning of the term 'refund,' which is '{t}he return of money overpaid.'" Def.'s Interrog. Responses at 3-4 (Interrog. No. 3) (quoting *Refund* (2), Black's Law Dictionary (11th ed. 2019)). That definition does not address the form in which the money needs to be returned. One of CBP's Rule 30(b)(6) designees – and the author of the 2010 CBP Letter – admits that an RTF that is fully utilized by the customer to purchase a new ticket qualifies as a refund. *See, e.g.*, Ingalls Dep. at 65:17-66:3 (a "refund" has been given where the airline "gave the passenger all of their money back via credit, and he used that credit as if he were putting down cash"); *id*. at 80:20-81:5. Thus, Defendant admits that a "refund" does not need to be made in cash or by a return of funds to the customer's method of payment.

Notably, Black's Law Dictionary also defines "refund" as "{t}he return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings." *Refund* (1), Black's Law Dictionary (11th ed. 2019)).

For that reason, and because the Fee works similar to a tax, authorities addressing the meaning of "refund" in the tax context are particularly useful. Those authorities allow for refunds to be in the form of credit.

For example, *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997) holds that credits given by an airline to its customers in exchange for cancelled tickets qualify as "refunds," even if those credits ultimately cannot be used for anything. *United Airlines* involved the federal excise tax on air transportation under 26 U.S.C. § 4261. Recall that a carrier is permitted to obtain a refund of that tax only in limited circumstances, including when the carrier "has repaid the amount of such tax to the person from whom he collected it." 26 U.S.C. § 6415(a). The question in *United Airlines* was whether "United refunded the full amount of the tax it had collected from the customer" so as to satisfy that aspect of § 6415(a). 111 F.3d at 552. In *United Airlines*, customers had cancelled their tickets and were subject to penalties for doing so. If the ticket was for travel from the continental United States to Hawaii, the penalty was 100% of the amount paid for the ticket, including taxes and fees. The penalties were automatically deducted from the refunds that would otherwise have been given to the customers, resulting in a net zero outcome to customers subject to the 100% penalty, who received no money back at all after they cancelled their tickets. Nonetheless, the court held that refunds of the tax were in fact given because the refund and the imposition of the penalty were two separate transactions that were netted against one another. *Id.* at 554.

The reasoning and holding of *United Airlines* applies with equal if not more force here. Southwest tickets were cancelled by customers in exchange for credits that customers subsequently elected not to use for travel. Unlike *United Airlines*, Southwest's customers actually had the ability to use the RTFs for new tickets, and most customers did exactly that;

24

CBP's Audit revealed that only 21 of the 88 RTFs went unused.  *See* SUMF ¶¶ 46, 58.  Further, here the issuance of the RTF when the ticket was cancelled and the eventual expiration of the RTF were two separate transactions separated in time (arguably more compelling than the refund and simultaneous penalty netted against the refund in the *United Airlines* case).  *See* SUMF ¶ 34. Thus, *United Airlines* supports the conclusion that the issuance of an RTF is in fact a refund, despite its ultimate expiration.

The IRS has repeatedly held that credits of various sorts qualify as "refunds."  *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 (discussed below); Rev. Proc. 2011-17, 2011-1 C.B. 441 (in connection with a customer returning merchandise, allowing the store to treat the issuance of a gift card to the customer as the equivalent as a cash refund).

Revenue Ruling 89-109 – which, like *United Airlines*, involves the excise tax under 26 U.S.C. § 4261 – is particularly noteworthy because it expressly approves of an airline giving "the passenger a refund by credit rather than by cash."  1989-2 C.B. at 233.  To understand the Revenue Ruling, it is first necessary to understand an important difference between that excise tax and the Fee.  As discussed above, the Fee is owed whenever there is a passenger who travels on a plane into the United States.  Unlike the Fee, the § 4261 excise tax does not require actual travel.  Instead, the tax is imposed whenever there is an "amount paid for taxable transportation of any person."  26 U.S.C. § 4261(a); *see also* Rev. Rul. 89-109, 1989-2 C.B. at 233 ("The tax on transportation of persons by air applies to the amount paid for the transportation and not to the actual transportation itself.").

Revenue Ruling 89-109 addresses a situation where "the airline will refund less than the full purchase price in the event of cancellation of the ticket by the purchaser."  1989-2 C.B. at 233.  The IRS held that any amount of the ticket price that is refunded to the customer essentially undoes the tax owed to the IRS as to that portion of the ticket price:  "{t}o the extent the airline refunds to the passenger the amount paid for the air transportation, the collected transportation tax attributable to the amount of such refund may be refunded to such passenger."[9]  *Id.*  "However, to the extent the airline does not refund to the passenger the amount paid for the air transportation, the collected transportation tax attributable to such nonrefunded amount is to be remitted by the airline to the Government."  *Id.*  Notably for present purposes, the IRS stated that "{t}his holding is equally applicable to a situation in which a carrier allows the passenger a refund by credit rather than by cash."  *Id.*  Thus, according to the IRS, a credit given to the customer for a cancelled ticket qualifies as a "refund."

Outside the tax context too, courts have held that credits qualify as "refunds."  For example, *Caver v. Central Alabama Electric Cooperative*, 845 F.3d 1135 (11th Cir. 2017), dealt with a state statutory requirement that an electric cooperative distribute its "excess revenues" to its members either via "'patronage refunds'" or "'general rate reductions.'"  *Id.* at 1147 (quoting Ala. Code § 37-6-20).  A member sued a cooperative because it distributed excess revenues to its members via "credits to their capital accounts, as opposed to making cash payments."  *Id.* at 1138; *see also id.* at 1147.  The member argued that in order to qualify as "patronage refunds," the amounts had to be paid "in the form of an annual cash payment to its members."  *Id.* at 1147.

---

[9] Returning briefly to the statutory interpretation issues addressed above in Argument section I, Defendant's view improperly treats the Fee like the excise tax, where the incidence of the tax is the payment of money and eliminating liability for the tax requires a refund of that money.  But that is not how the Fee works.  The Fee is imposed not on the payment of money, but rather on the arrival of a passenger on a plane into the United States.

The member argued that "'credits' to members' capital accounts does not constitute a refund because {the cooperative's} members cannot access the credits." *Id.* The credits are not paid out "in cash for years. Sometimes those payouts come as late as thirty years after the credits are earned and when the members to whom they are owed can no longer be found." *Id.* at 1141.

The court nonetheless held that the credits qualified as patronage refunds. *Id.* at 1147-48. The court noted that the statute did not "define the term 'patronage refund'" and did not expressly "require a cash payment," and the court reasoned that "{n}othing in the statute imposes the specific requirement that all patronage refunds be made in a cash manner." *Id.* at 1147. The court also noted that the cooperative's bylaws permitted distribution of excess revenues via credits to members' capital accounts. *Id.* Accordingly, such credits qualified as "refunds" under the statute. The same logic applies here. "Refund" is not defined in 19 U.S.C. § 58c (indeed, that term is not even used in the statute or in the regulation), there is no express requirement anywhere for a cash or cash-like refund, and the contract between Southwest and its customers expressly allows refunds to be made in the form of travel credit that will expire if not used.[10]

**B.    As a Factual Matter, RTFs Are Refunds When Issued.**

CBP has never responded to Southwest's factual arguments that RTFs are considered to be refunds when issued. Nonetheless, Southwest re-urges its position here.

Southwest's Contract of Carriage makes clear that "travel credit," *i.e.*, RTFs, are refunds. To begin with, the Contract of Carriage provisions describing travel credit are found in Section 4.c.(3), with that section coming under a heading (at Section 4.c.) called "Refunds." SUMF ¶ 22.

---

[10] Southwest cited most of the aforementioned authorities to the auditors during the Audit (ECF No. 14-1 at ECF p. 44) and in its Protest (*id.* at ECF pp. 9-10), but CBP has never offered a response (*id.* at ECF pp. 45-46, 129-32).

Moreover, Section 4.c.(3)(i) states:  "The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, *except as provided in this Section and Section 9b.*"  SUMF ¶ 22.  Thus, the Contract of Carriage establishes that "refunds" do occur even for so-called nonrefundable tickets, but only as provided in the cited sections of the Contract of Carriage, *i.e.*, Section 4.c. and Section 9.b.  *Id.*  Section 4.c.(3) then goes on to explain the form of the refund:  "Travel Credit.  Unless otherwise stated by the Carrier, the fare paid for unused nonrefundable Tickets, including taxes, security fees, and Passenger Facility Charges, may be applied toward the purchase of future travel on Carrier for the originally ticketed Passenger only."  SUMF ¶ 8; *see also id.* ¶ 22.

Consistent with the Contract of Carriage, when Southwest communicated with customers who had cancelled their tickets in exchange for RTFs, Southwest specifically referred to a "REFUND" occurring on the date the ticket was cancelled and the RTF was issued.  SUMF ¶ 24.  For example, the following is part of such a confirmation e-mail:[11]



**Cost and Payment Summary**

| ✈ AIR - 372SLX | | |
|---|---|---|
| Base Fare | $ 966.00 | **Payment Information** |
| Excise Taxes | $ 36.00 | Payment Type: Univ Air Travel |
| US customs User Fee | $ 5.50 | XXXXXXXXXXX0007 |
| Animal and plant health inspection fee | $ 3.96 | Date: Dec 20, 2016 |
| | | Payment Amount: $1058.79 |
| US Immigration and Naturalization user fee | $ 7.00 | |
| September 11th Security Fee | $ 5.60 | REFUND ON Dec 20, 2016 TO Residual Travel Funds $1058.79 |
| | $ 13.13 | |
| | $ 1.25 | |
| | $ 15.85 | |
| Passenger Facility Charge | $ 4.50 | |
| **Total Air Cost** | **$1058.79** | |

---

[11] The entire e-mail can be found at ECF No. 14-1 at ECF pp. 69-70.

The text towards the bottom of the right side plainly states:  "REFUND ON Dec 20, 2016 TO Residual Travel Funds $1,058.79," with that amount equaling the total amount paid for the ticket including airfare, taxes, the Fee, and other fees.  Thus, the Fee (and all other components of the purchase price) was refunded to the customer in the form of an RTF.

Southwest's customers and the travelling public also view RTFs as refunds.  SUMF ¶ 25. Customers refer to RTFs as refunds when they contact Southwest's Customer Relations department to offer compliments regarding Southwest's advantageous refund policies.  *Id*. ¶ 26. And, in 2017, Forbes published an article about Southwest's favorable "refund policies" that also refers to RTFs as refunds.  *Id*. ¶ 27.  The Forbes article has a section entitled "Refund Policy Overview" that explains that "the price of non-refundable tickets is applied to future travel within one year of the purchase date."  *Id*.  The article continues:  "Since Southwest offers a *free* ticket change policy {*i.e.*, the customer can cancel the ticket and use the resulting RTF to buy a new ticket}, *you are getting a full refund* of the price you paid for your ticket to apply towards your next trip."  *Id*. (first emphasis in original; second emphasis added).[12]

Likewise, Southwest's internal systems and records explicitly refer to RTFs as "refunds." SUMF ¶ 23.  And Southwest's employees consider RTFs to be refunds.  As Southwest's then-Vice President of Customer Relations and Rapid Rewards put it:  "At Southwest, as soon as an RTF is issued and regardless of whether it is eventually used, we consider the RTF to be a refund in every sense of the word."  Ruppel Decl. ¶ 9 (ECF No. 14-1 at ECF pp. 63-64); *see also* Jaycox Decl. ¶ 11 (ECF No. 14-1 at ECF p. 80) ("From an accounting – and in every other – perspective, RTFs are refunds to customers.  That is true immediately upon the issuance of the RTFs and is true regardless of whether the RTFs are eventually used by the customers.").

---

[12] The complete Forbes article can be found at ECF No. 14-1 at ECF pp. 72-76.

Finally, even one of CBP's own auditors described RTFs as refunds. In an audit of Southwest involving a different air passenger user fee, a CBP auditor described RTFs as instances where the customer "*retain{s} all funds* for future use to purchase another ticket to fly on Southwest" and where the "total amount paid for the cancelled ticket (base fare plus all passenger taxes and fees associated with the itinerary) *is refunded* to the customer in the form of a residual travel fund (RTF)." SUMF ¶ 28 (emphasis added).

## CONCLUSION

CBP has illegally exacted $444,673.39 from Southwest, for three separate reasons. First, the statute and the regulation are clear that CBP is entitled to a Fee only when a passenger arrives from abroad into the United States on a commercial aircraft, which never occurred for any of the Error Tickets. The Fee is a true user fee that compensates CBP for rendering customs services, and CBP provided no such services here. Second, even if CBP could be entitled to a Fee when no passenger travelled (and CBP performed no services) and Fee liability instead depended on whether there was a collected Fee, the funds originally collected as Fees on the Error Tickets lost their character as such once the tickets were canceled and RTFs were issued to the customer (regardless of whether RTFs qualify as "refunds"). There is no statutory, regulatory, or other basis for Defendant's view that the only way to undo a collected Fee is via a cash or cash-like "refund" to the customer. The sole source of Defendant's view is the 2010 CBP Letter, which is not the law, cites no authority for its position, and for which Defendant has waived the right to argue is entitled to any deference. Third, even if Southwest were wrong on the prior two points and instead the 2010 CBP Letter were somehow the law, Southwest in fact gave refunds of the full amount paid for the Error Tickets when it issued RTFs upon ticket cancellation. For any of these three independent reasons, the Court should grant Southwest's motion for summary

judgment and should enter judgment in Southwest's favor against Defendant in the amount of

$444,673.39, plus interest thereon as allowed by law.

April 30, 2024
Washington, DC                              Respectfully submitted.

                                            _/s/ Adam P. Feinberg_____
                                            Adam P. Feinberg
                                            Richard A. Mojica
                                            Miller & Chevalier Chartered
                                            900 16th Street NW
                                            Washington, DC 20006
                                            Phone: (202) 626-5800
                                            Fax: (202) 626-5801
                                            afeinberg@milchev.com
                                            rmojica@milchev.com

                                            *Attorneys for Plaintiff, Southwest Airlines Co.*

31

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HON. GARY S. KATZMANN, JUDGE

_____

|  |  |  |
|---|---|---|
| | : | |
| SOUTHWEST AIRLINES CO., | : | |
| | : | |
| Plaintiff, | : | Court No. 22-00141 |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

_____:

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with the U.S. Court of International Grade Standard Chambers Procedures,

I, Adam P. Feinberg, state that this brief complies with the word count limits and contains 10,449

words.  I have relied on the word count of the word-processing system used to prepare the brief

(and added 75 words for the image embedded on page 28).


April 30, 2024
Washington, DC                              Respectfully submitted.


                                              _/s/ Adam P. Feinberg_____
                                              Adam P. Feinberg
                                              Richard A. Mojica
                                              Miller & Chevalier Chartered
                                              900 16th Street NW
                                              Washington, DC 20006
                                              Phone: (202) 626-5800
                                              Fax: (202) 626-5801
                                              afeinberg@milchev.com
                                              rmojica@milchev.com

                                              *Attorneys for Plaintiff, Southwest Airlines Co.*