**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ———————————————————— : | |
| SOUTHWEST AIRLINES CO., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Court No. 22-00141 |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant. : | |
| ———————————————————— : | |

## <u>ORDER</u>

Upon consideration of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, and upon consideration of all other papers and proceedings had herein; it is hereby

**ORDERED** that defendant's cross-motion for summary judgment is granted;

**ORDERED** that plaintiff's motion for summary judgment is denied; and it is further

**ORDERED** that judgment is entered for defendant and this action is dismissed.


                                          _____
                                          JUDGE GARY S. KATZMANN


Dated: _____
        New York, New York

**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. GARY S. KATZMANN, JUDGE

_____
                                                    :
SOUTHWEST AIRLINES CO.,                :
                                                    :
                              Plaintiff,         :
                                                    :
                    v.                            :          Court No. 22-00141
                                                    :
UNITED STATES,                              :
                                                    :
                              Defendant.       :
_____:

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN**
**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of International Trade

(USCIT), defendant, the United States, respectfully moves for an order granting defendant's

cross-motion for summary judgment, denying plaintiff's motion for summary judgment, and

dismissing this action.  The reasons for our cross-motion are set forth in the accompanying

memorandum, defendant's response to plaintiff's USCIT Rule 56.3 statement of facts not in

dispute, and defendant's USCIT Rule 56.3 statement of undisputed material facts.

**PUBLIC VERSION**

WHEREFORE, defendant respectfully requests that an order be entered granting defendant's cross-motion for summary judgment, denying plaintiff's motion for summary judgment, entering judgment for defendant, dismissing this action, and granting defendant such other and further relief as may be just and appropriate.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td>By:</td><td><u>/s/ Aimee Lee</u><br>AIMEE LEE<br>Assistant Director<br>International Trade Field Office</td></tr>
</table>

Of Counsel:                          <u>/s/ Guy Eddon</u>
James R. Cohee                       GUY EDDON
Senior Attorney                      Trial Attorney
Office of the Assistant Chief Counsel,   International Trade Field Office
Indianapolis                         Department of Justice, Civil Division
U.S. Customs and Border Protection   Commercial Litigation Branch
                                     26 Federal Plaza, Room 346
                                     New York, New York 10278
                                     (212) 264-9230 or 9236
                                     *Attorneys for Defendant*

Dated:  August 13, 2024

**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. GARY S. KATZMANN, JUDGE

_____
                                   :

SOUTHWEST AIRLINES CO.,         :
                                     :

              Plaintiff,     :

                                     :

            v.              :     Court No. 22-00141

                                     :

UNITED STATES,             :

                                     :

             Defendant.   :
_____:

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR
SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       PATRICIA M. McCARTHY
                                       Director

                                       AIMEE LEE
                                       Assistant Director
                                       International Trade Field Office

Of Counsel:
James R. Cohee                          GUY EDDON
Senior Attorney                      Trial Attorney
Office of the Assistant Chief Counsel,    International Trade Field Office
Indianapolis                         Department of Justice, Civil Division
U.S. Customs and Border Protection      Commercial Litigation Branch
                                       26 Federal Plaza, Room 346
                                       New York, New York 10278
                                       (212) 264-9230 or 9236
                                       *Attorneys for Defendant*

Dated:  August 13, 2024

PUBLIC VERSION

# TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 2

   A.  The Statutory Basis For The Customs Inspection Fee ................................ 2

   B.  CBP Provides Guidance To The Commercial Airline Industry ................... 4

STATEMENT OF FACTS ......................................................................................... 5

   A.  Southwest Collected The Required Fee With Each Ticket Sold ................... 6

   B.  Southwest's Expiring, Nontransferrable Travel Vouchers ......................... 6

   C.  The CBP Audit Of Southwest's Fee Remittances ....................................... 7

   D.  Southwest's Protest And Lawsuit ................................................................ 8

QUESTION PRESENTED ......................................................................................... 9

SUMMARY OF ARGUMENT ................................................................................... 9

ARGUMENT .............................................................................................................. 9

   I.    Jurisdiction ................................................................................................... 9

   II.   Standard Of Review .................................................................................... 10

   III.  Southwest Is Statutorily Required To Collect And Remit The
       Customs Inspection Fee ............................................................................. 11

   IV.  CBP's Guidance Explains How Airlines Should Account For Cancelled Tickets .......... 14

   A.  Southwest Did Not Provide A Refund For The Customs Fee It Collected On
       Cancelled Tickets ...................................................................................... 14

   B.  A Nontransferable, Expiring Travel Voucher Is Not A Monetary Refund ..................... 16

   C.  The Statutory Customs Inspection Fee Collected By Southwest Is
       Held In Trust For The Government .............................................................. 19

CONCLUSION ......................................................................................................... 24

PUBLIC VERSION

## TABLE OF AUTHORITIES

**Cases**

*Am. Express Co. v. United States,*
262 F.3d 1376 (2001)..................................................................... 14

*American Airlines, Inc. v. U.S.,*
551 F.3d 1294 (Fed. Cir. 2008)................................................... 12, 13, 19

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)................................................................... 10, 11

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)......................................................................... 11

*Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico,*
281 F.3d 1249 (Fed. Cir. 2002)............................................................ 10

*Chisolm v. W. Reserves Oil Co.,*
655 F.2d 94 (6th Cir. 1981) ............................................................... 22

*Counihan v. Allstate Ins. Co.,*
194 F.3d 357 (2d Cir. 1999).................................................... 21, 22, 23

*Ide v. British Airways PLC,*
529 F.Supp.3d 73 (S.D.N.Y. 2021)....................................................... 16

*In re Columbia Gas Systems Inc.,*
997 F.2d 1039 (3rd Cir. 1993) ............................................................ 20

*In re Easysaver Rewards Litigation,*
906 F.3d 747 (9th Cir. 2018) ............................................................. 16

*In re Mex. Money Transfer,*
267 F.3d 743 (7th Cir. 2001) ............................................................. 16

*In re Penn Central Transp. Co.,*
486 F.2d 519 (3d Cir.1973)............................................................... 20

*Jayre California, Inc. v. United States,*
14 CIT 29 (1990) .......................................................................... 11

*Loper Bright Enterprises v. Raimondo,*
603 U.S. ___ (2024)....................................................................... 16

*Massachusetts Mut. Life Ins. Co. v. U.S.,*
782 F.3d 1354 (Fed. Cir. 2015)...................................................... 14, 15

*McAuliffe v. Vail Corp.,*
69 F.4th 1130 (10th Cir. 2023) ............................................................ 15

*Norfolk and Western Ry. Co. v. U.S.,*
18 C.I.T. 55 (1994) ............................................................................... 10

*Phone-Mate, Inc. v. United States,*
690 F. Supp. 1048 (Ct. Int'l Trade 1988)
*aff'd* 867 F.2d 1404 (Fed. Cir. 1989) ............................................. 10, 11

*Roes, 1–2 v. SFBSC Mgmt., LLC,*
944 F.3d 1035 (9th Cir. 2019) ............................................................. 17

*Sweats Fashion, Inc. v. Pannill Knitting Co.,*
833 F.2d 1560 (Fed. Cir. 1987) ........................................................... 11

*Texas Apparel Co. v. United States,*
698 F. Supp. 932 (Ct. Int'l Trade 1988)
*aff'd* 883 F.2d 66 (Fed. Cir. 1989) ..................................................... 10

*United States v. McConnell,*
258 B.R. 869 (N.D. Tex. 2001) ..................................................... 19, 20

*United States v. Monsanto,*
491 U.S. 600 (1989) ............................................................................. 11

*United Airlines v. United States,*
111 F.3d 551 (7th Cir. 1997) .......................................................... 17, 18

*Weizmann Inst. of Sci. v. Neschis,*
229 F. Supp. 2d 234 (S.D.N.Y. 2002) .................................................. 21

*Xianli Zhang v. United States,*
640 F.3d 1358 (Fed.Cir.2011) ............................................................. 14


**Statutes**

8 U.S.C. § 1356(f) ............................................................................... 12

19 U.S.C. § 58c ......................................................................... 9, 10, 11

19 U.S.C. § 58c(a)(5) ............................................................................. 3

19 U.S.C. § 58c(a)(5)(A) ................................................... 3, 11, 12, 13

19 U.S.C. § 58c(d) ............................................................................... 12

19 U.S.C. § 58c(d)(1) ............................................................................. 3

**PUBLIC VERSION**

19 U.S.C. § 58c(d)(1)(A) ..................................................................................... 3, 11, 13

19 U.S.C. § 58c(d)(1)(B) .............................................................................................. 18

19 U.S.C. § 58c(d)(2) ................................................................................................... 11

19 U.S.C. § 58c(d)(3) ............................................................................... 3, 11, 13, 18

19 U.S.C. § 58c(g)(2) ................................................................................................... 10

19 U.S.C. § 58c(j)(2) .................................................................................................... 12

19 U.S.C. § 1514 ...................................................................................................... 9, 10

19 U.S.C. § 1514(a)(2)-(3) .......................................................................................... 10

28 U.S.C. 1581(a) .......................................................................................................... 9

**Rules**

USCIT Rule 56 ................................................................................................................ 1

USCIT Rule 56 (a) .......................................................................................................... 9

**Regulations**

19 C.F.R. § 24.22(g) ............................................................................................. 1, 3, 9

19 C.F.R. § 24.22(g)(1) ............................................................................................ 3, 12

19 C.F.R. § 24.22(g)(4) .................................................................................................. 3

19 C.F.R. § 24.22(g)(5) ........................................................................................ *passim*

**Other Authorities**

*Commercial Aviation: Consumers Could Benefit from Better Information about Airline-Imposed Fees and Refundability of Government-Imposed Taxes and Fees* (July 14, 2010), *available at* https://www.gao.gov/products/gao-10-785 ................................................. 5

HQ315101 ....................................................................................................................... 8

PAYMENT, *Black's Law Dictionary* (12th ed. 2024) .................................................. 18

REFUND, *Black's Law Dictionary* (12th ed. 2024) .................................................... 15

**PUBLIC VERSION**

REFUND, *Merriam Webster Dictionary*,
available at, https://www.merriam-webster.com/dictionary/refund ........................................... 15

CONSTRUCTIVE TRUST, *Merriam Webster Dictionary*,
*available at*, https://www.merriam-webster.com/dictionary/trust#legalDictionary ................... 20

TRUST, *Black's Law Dictionary* (12th ed. 2024)........................................................................ 20

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. GARY S. KATZMANN, JUDGE

_____
                                                    :
SOUTHWEST AIRLINES CO.,                             :
                                                    :
                              Plaintiff,            :
                                                    :
              v.                                    :        Court No. 22-00141
                                                    :
UNITED STATES,                                      :
                                                    :
                              Defendant.            :
_____     :

### DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO PLAINTIFF'S <u>MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Rules of the United States Court of International Trade (USCIT), defendant, United States (the Government), hereby submits this memorandum in support of its cross-motion for summary judgment and response in opposition to plaintiff Southwest Airlines Co.'s (Southwest's) motion for summary judgment.

This case of first impression raises the question whether the customs inspection fee charged and collected by Southwest from its customers, pursuant to 19 U.S.C. § 58c and 19 C.F.R. § 24.22(g), at the time the airline ticket is purchased, can be retained as profit by Southwest when that airline ticket is canceled.  The answer to this question is more straightforward than Southwest's seventy-three statements of fact let on.  Pl.'s Rule 56.3 Statement of Undisputed Material Facts, ECF No. 40-2.  For every ticket at issue in this case, Southwest collected a customs inspection fee on behalf of the Government as required by law. When the ticket was subsequently canceled, Southwest issued a nontransferable travel voucher to the customer, which expired one year after issuance and was not redeemed.  Upon expiration of that voucher, Southwest did not refund the customs inspection fee, that it collected as part of the

purchased ticket, to its customer.  Instead, the original ticket value and all taxes and fees, including the customs inspection fee at issue here, was retained by Southwest as profit.  In essence, Southwest's travel vouchers, which encompass the Government's inspection fee, have an inherent reversionary interest—one year after they are issued the vouchers expire, and the Government's fee "reverts" to Southwest's bottom line.

In this case, not only did the Government not receive the monies that Southwest was statutorily required to collect from its passengers on the Government's behalf, but not a single Southwest customer received a refund of the customs inspection fee when they cancelled their ticket.  For all tickets at issue, Southwest ultimately pocketed the customs inspection fee when the travel voucher expired unused.  Southwest is not entitled to be enriched by the Government's inspection fee that it is statutorily required to collect.  Customs inspection fees collected in the Government's name that are not refunded to the customer must be paid to the United States.  Accordingly, we respectfully request that judgment be entered in the defendant's favor and that this action be dismissed.

## **BACKGROUND**

This case concerns a specific category of Southwest airline tickets which were purchased for travel abroad from July 1, 2014, through June 30, 2017, and were subsequently cancelled by the customer.  The case asks the Court to answer the question of which party should retain the customs inspection fee collected by Southwest on behalf of the United States for customs inspection services, where the ticket is cancelled by Southwest's customer and the inspection fee is not refunded to Southwest's customer—Southwest or the United States?

PUBLIC VERSION

A.      **The Statutory Basis For The Customs Inspection Fee**

Subject to certain exemptions not applicable here, at the time a commercial airline ticket

is issued, customers purchasing a ticket for travel arriving in the United States from a foreign

country are responsible for paying the fee for the customs inspection services that CBP provides

to passengers upon arrival.  *See* 19 U.S.C. §§ 58c(a)(5), (d)(1)(A); 19 C.F.R. § 24.22(g).

Section 58(c)(a)(5)(A) provides that "[t]he Secretary of the Treasury shall charge and collect the

following fees … for the arrival of each passenger aboard a commercial vessel or commercial

aircraft …".  19 U.S.C. § 58c(a)(5)(A).  *See also* 19 C.F.R. § 24.22(g)(1) (stating that a fee "must

be collected and remitted to CBP for services provided in connection with the arrival of each

passenger aboard a commercial vessel or commercial aircraft…").  The statute goes on to

provide for the collection of such fee in subsection (d)(1), which states:

> Each person that issues a document or ticket to an individual for transportation by a
> commercial vessel or commercial aircraft into the customs territory of the United States
> shall—
>
> (A) Collect from that individual the fee charged under subsection (a)(5) at the time the
>     document or ticket is issued; and
>
> (B) Separately identify on that document or ticket the fee charged under
>     subsection (a)(5) as a Federal inspection fee.

19 U.S.C. § 58c(d)(1).  *See also* 19 C.F.R. § 24.22(g)(4) (providing that each air carrier "issuing

a ticket or travel document for transportation into the customs territory of the United States is

responsible for collecting from the passenger the applicable fee specified…").  Moreover, "[t]he

person who collects fees under paragraph (1) or (2) shall remit those fees to the Secretary of the

Treasury at any time before the date that is 31 days after the close of the calendar quarter in

which the fees are collected."  19 U.S.C. § 58c(d)(3).  *See also* 19 C.F.R. § 24.22(g)(5)

("Payment to CBP of the fees required to be collected under paragraph (g)(1) of this section must

be made no later than 31 days after the close of the calendar quartering which the fees were required to be collected from the passenger.").

In addition to the statute, the regulations provide that "[o]verpayments and underpayments" of the inspection fee by an airline in a particular quarter "may be accounted for by an explanation with, and adjustment of, the next due quarterly payment to CBP." 19 C.F.R. § 24.22(g)(5). In practice, this results in a system where international commercial airline carriers report to CBP, on a quarterly basis, the amount of inspection fees that have been collected based on the number of international tickets sold, the dollars collected, and the dollars being remitted from the airline to CBP for the quarter. Airlines may also report the amount of any credit claimed against the inspection fees remitted for the quarter, for example, because of an overpayment stemming from cancelled tickets for which the inspection fees were remitted in a prior quarter.

**B.    CBP Provides Guidance To The Commercial Airline Industry**

In 2010, in response to a recommendation from the Government Accountability Office (GAO) to provide clarity to the commercial airline industry regarding refunds of Government fees, CBP issued guidance in the form of two nearly identical letters to the International Air Transport Association (IATA) and the Air Transport Association (ATA) of America. Exh. A, Letter from Bruce Ingalls, Director of CBP's Revenue Division, to Douglas E. Lavin, Regional Vice President for North America, International Air Transport Association (Oct. 28, 2010); Exh. B, Letter from Bruce Ingalls, Director of CBP's Revenue Division, to James C. May, President and Chief Executive Officer, Air Transport Association of America (Oct. 28, 2010). The letters clarified that CBP fees collected in connection with nonrefundable tickets should be refunded to the customers if a ticket is cancelled. The letters also explained the process for

airlines to follow when taking credits on quarterly remittances under 19 C.F.R. § 24.22(g)(5) when "nonrefundable" tickets are cancelled.

CBP's letters state that, if the carrier has not already remitted the inspection fee to CBP when a ticket is cancelled, "the airline should simply refund the fees for the unused ticket to the purchaser and adjust its fee collection remittances appropriately." *See* Exh. A at 1 and Exh. B at 1. CBP's letters go on to provide that "[i]f the airline has already remitted the fees to CBP at the time the purchaser of the unused ticket requests fee refunds, the airline should still refund the fees to the purchaser and deduct the refunded fees from the next quarterly user fee payment due to CBP." *Id.* In addition, CBP explained that "[t]o the extent [inspection] fees are collected on behalf of CBP for unused tickets and such fees are not refunded to purchasers, the [inspection] fees are considered to be held in trust for the United States and must still be remitted, without credit, to CBP." *Id.* As a result of CBP's letter, the GAO concluded that CBP "implemented" the GAO's recommendation and stated that "the ambiguity regarding the refund of customs and immigration fees has been clarified." GAO-10-785, *Commercial Aviation: Consumers Could Benefit from Better Information about Airline-Imposed Fees and Refundability of Government-Imposed Taxes and Fees* (July 14, 2010), *available at* https://www.gao.gov/products/gao-10-785 (last visited June 4, 2024).

## <u>STATEMENT OF FACTS</u>

The category of Southwest tickets at issue in this action are so-called "nonrefundable" tickets for which the required customs inspection fee was charged and collected by Southwest. The following undisputed facts pertain to the tickets at issue.

**A.      Southwest Collected The Required Fee With Each Ticket Sold**

Southwest, in accordance with the statute, separately identified and collected the required customs inspection fee when it sold a ticket for international travel on its commercial aircraft. *See, e.g.*, ECF No. 14-1 at ECF page 70 (identifying the "US customs User Fee").  After selling the ticket and collecting the fee, Southwest is then required to remit the customs inspection fee in connection with that ticket sale within the required timeframes (*i.e.,* within thirty-one days after the calendar quarter in which the ticket was sold).

**B.      Southwest's Expiring, Nontransferable Travel Vouchers**

When a Southwest customer purchases a so-called "nonrefundable" ticket but then cancels the trip, Southwest gives its customers a travel voucher in the amount of the fare, taxes, and fees, including the customs inspection fee, instead of a monetary refund.  Southwest Contract of Carriage § 4.c(3)(i) (ECF No. 14-1 at 100) ("The fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets are not eligible for refunds, except as provided in this Section and Section 9b.  Taxes, security fees, and Passenger Facility Charges associated with a nonrefundable fare are also not eligible for refund except as required by applicable regulations.").  The nontransferable voucher can be applied towards travel on a future Southwest flight for the "originally ticketed Passenger only."  *Id.* at § 4.c(3)(ii).  Under Southwest's Contract of Carriage, a "refund" and a "travel credit" are separate concepts.  *See id.* at § 4.c(1) (discussing cancelled refundable tickets as "either be[ing] refunded or applied as travel credit toward the purchase of future travel for the originally ticketed Passenger.").  If the customer failed to redeem the travel voucher within one year from the date the original ticket was purchased, the full amount of the travel credit was forfeited to Southwest.  *Id.* at § 4.c(3)(iv) ("Should a Passenger fail to apply the nonrefundable Ticket or travel credit toward the purchase

of future travel within the eligibility period, the entire amount of the fare, including all taxes, security fees, and Passenger Facility Charges, will be forfeited.").

Additionally, when the customer canceled their travel plans, Southwest took a corresponding credit on its next quarterly remittance to CBP of the customs inspection fees.  If the customer later redeemed the travel voucher for a ticket on another Southwest international flight, Southwest re-remitted the inspection fee to the Government.  But, for each cancelled ticket at issue here, where the travel voucher expired without being redeemed by the customer, Southwest did not refund the inspection fee to the customer, nor did it remit the customs inspection fee it collected to the Government.  Instead, the customs inspection fees that Southwest collected from its customers but failed to remit to the Government were retained by Southwest as a windfall profit.

**C.     The CBP Audit Of Southwest's Fee Remittances**

To ensure the accuracy of commercial airline carrier statements, remittances, and claimed credits, CBP periodically audits commercial carriers' records.  In September 2017, CBP initiated an audit of Southwest.  Joint Fact Stipulation ¶ 5.  The auditors focused on Southwest's practice of remitting and subsequently taking credits for customs inspection fees collected on nonrefundable tickets based upon the issuance of a travel voucher.  CBP sampled one hundred nonrefundable tickets to determine whether the customs inspection fee was remitted to the Government or returned to the customer.  Joint Fact Stipulation ¶ 8.  CBP determined that, in twenty-one (21) instances out of those one hundred sampled, the customer's travel voucher expired unused, and the customs inspection fee was not refunded to the customer or remitted to the Government.  Joint Fact Stipulation ¶ 12.  CBP's auditors determined these twenty-one instances where the travel vouchers expired unused to be "errors."  Joint Fact Stipulation ¶ 16.

These errors from the unused and expired Southwest travel vouchers resulted in an under remittance by Southwest of $378,118.13 in the statutory inspection fees to the Government for the audit period.  *Id.*

In November 2019, CBP issued audit report number 641-17-UF1-UF-26147 concluding that Southwest had a net under-remittance of $378,188.13 during the audit period from July 1, 2014, through June 30, 2017.  Joint Fact Stipulation ¶¶ 6-8 and ¶ 16; *see also*, User Fee Audit Report, ECF No. 14-1, ECF pages 14-48.  The liability was calculated by extrapolating the twenty-one unused and expired travel vouchers of the one hundred tickets analyzed in the audit, over Southwest's fee remittances during the audit period.  *Id.*

**D.    Southwest's Protest And Lawsuit**

CBP billed Southwest based upon the audit findings and, on March 4, 2020, Southwest paid, under protest, the amount demanded with applicable interest.  On May 13, 2020, Southwest filed an administrative protest of the charges it paid along with an Application for Further Review.  On August 11, 2021, CBP's Office of Regulations and Rulings (ORR) issued decision HQ315191 recommending denial of Southwest's protest.  CBP's Revenue Division sent Southwest the decision and a letter formally denying the protest on November 9, 2021.

Southwest filed the instant action on May 6, 2022.  Summons, ECF No. 1.  Southwest seeks a refund of the inspection fees and interest it paid under protest and a declaratory judgment on the issue of unused and expired travel vouchers.  *See* Am. Compl. at 12, Prayer for Relief (2) (ECF No. 19).

PUBLIC VERSION

## QUESTION PRESENTED

Whether the customs inspection fee collected by a commercial airline from its customers, as required by statute on behalf of the Government, can be retained for profit by the airline when a customer cancels their ticket.

## SUMMARY OF ARGUMENT

Southwest is statutorily required to first collect a customs inspection fee from its customers at the time a ticket is issued, and to then remit that fee to the Government.  19 U.S.C. § 58c and 19 C.F.R. § 24.22(g).  Instead of remitting the inspection fee to the Government, when Southwest's customers cancelled their travel plans, Southwest issued its customers a nontransferable, expiring travel voucher that is forfeited if not used within one year.  However, Southwest's "generous" cancellation policy with respect to its "nonrefundable" tickets cannot change the law.  Because the statute requires Southwest to collect the fee and remit the fees collected to the Government, Southwest is not entitled to retain the Government's customs inspection fee and gain from that fee by pocketing it as a revenue, as it did with each cancelled ticket at issue in this case.  Accordingly, our cross-motion for summary judgment should be granted, Southwest's motion for summary judgment should be denied, and this action should be dismissed.

## ARGUMENT

### I.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 1581(a) as to Southwest's challenge of the customs inspection fee assessment.  Section 1581(a) provides the Court of International Trade with jurisdiction over "any civil action commenced to contest the denial of a protest" under 19 U.S.C. § 1514.  A person may protest "decisions of the Customs Service, including the legality

of all orders and findings entering into the same, as to… (2) the classification and rate and amount of duties chargeable; [and] (3) all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury[.]"  19 U.S.C. § 1514(a)(2)-(3).  For purposes of "administrative … provisions of customs laws," such as the protest process under 19 U.S.C. § 1514, the customs inspection fee is treated "as if such fee is a customs duty."  19 U.S.C. § 58c(g)(2).  Moreover, inspection fees prescribed by 19 U.S.C. § 58c are considered charges or exactions within the meaning of 19 U.S.C. § 1514.  *See Norfolk and Western Ry. Co. v. U.S.*, 18 C.I.T. 55, 61 (1994).

## II.   Standard Of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).  "In evaluating a motion for summary judgment, the evidence of the non-movant is to be believed and all justifiable inferences are drawn in favor of the non-movant. This standard is not changed when the parties bring cross-motions for summary judgment, each nonmovant receiving the benefit of favorable inferences."  *Chevron U.S.A. Inc. v. Mobil Producing Texas & New Mexico*, 281 F.3d 1249, 1252–53 (Fed. Cir. 2002) (citation omitted).

On a motion for summary judgment, the court determines whether there are any genuine factual disputes that are material to the resolution of the action.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Texas Apparel Co. v. United States*, 698 F. Supp. 932, 934 (Ct. Int'l Trade 1988), *aff'd*, 883 F.2d 66 (Fed. Cir. 1989), *cert. denied*, 110 S. Ct. 728 (1990) (citations omitted).  A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  "The court may not resolve or try factual issues on a motion for summary judgment."  *Phone-Mate, Inc. v. United*

*States*, 690 F. Supp. 1048, 1050 (Ct. Int'l Trade 1988), *aff'd*, 867 F.2d 1404 (Fed. Cir. 1989);

*Jayre California, Inc. v. United States*, 14 CIT 29, 32 (1990).

Here, there are no genuine disputes over material facts for purposes of granting the

Government's motion and this case is ripe for summary judgment. *See, e.g., Anderson*, 477 U.S.

at 247-248; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325-328 (1986); *Sweats Fashion, Inc. v.*

*Pannill Knitting Co.*, 833 F.2d 1560, 1562-1563 (Fed. Cir. 1987).

### III.     Southwest Is Statutorily Required To Collect And Remit
         The Customs Inspection Fee

The parties agree that the fee at issue here is "governed by 19 U.S.C. § 58c." Pl.'s Br.

at 10. According to the plain language of the statute, the Secretary of Treasury "*shall* charge and

collect" fees for each passenger aboard a commercial aircraft arriving into the United States. 19

U.S.C. § 58c(a)(5)(A) (emphasis added). As a commercial carrier, Southwest "*shall* collect" the

customs inspection fee as required by law from ticket purchasers "at the time the … ticket is

issued". 19 U.S.C. § 58c(d)(1)(A) (emphasis added). And Southwest, "as the person who

collects fees," "*shall* remit those fees" that it collects to CBP. 19 U.S.C. § 58c(d)(3) (emphasis

added); *see also* 19 C.F.R. § 24.22(g)(5); Joint Fact Stipulation ¶ 4. The term "shall" in a statute

is generally regarded as Congress's intent to make a provision mandatory. *U.S. v. Monsanto*,

491 U.S. 600, 607 (1989). Thus, there is no option not to collect the fee when Southwest sells a

ticket. Here, Southwest did collect the required fee on every international ticket sold to its

customers and the customers were aware that the fee was charged. 19 U.S.C. § 58c(d)(2). *See,*

*e.g.*, ECF No. 14-1 at ECF page 70 (identifying the "US customs User Fee"). Moreover, the

statute directs Southwest to remit the collected fee to CBP and is silent regarding the ultimate

disposition of the ticket.

Nevertheless, Southwest contends that "CBP has no authority to 'charge and collect' fees in connection with commercial airline passengers in any instances except those provided by statute, *i.e.*, only when a passenger on a commercial aircraft arrives in the United States." Pl.'s Br. at 11 (citing 19 U.S.C. § 58c(a)(5)(A)). However, as discussed above, the statute plainly provides the legal authority. Southwest also relies on 19 U.S.C. § 58c(j)(2), Pl.'s Br. at 11, but that provision merely relates to the effective date of the commercial passenger fee and does not support the theory that a fee may be charged only when a passenger on a commercial aircraft arrives in the United States.

Southwest further contends that the regulations support its position that no fee is owed if a ticket is cancelled. Pl.'s Br. at 13. However, the regulations, similar to the statute, provide that a fee "must be collected and remitted to CBP." 19 C.F.R. § 24.22(g)(1). Southwest views as significant the words "the fees required to be collected under paragraph (g)(1)" as opposed to the fees actually collected, to support its retention of the fee paid by its customer when the ticket goes unused. Pl.'s Br. at 13. Southwest fails to recognize that the fee was in fact charged, collected, and that payment to CBP of the fees "must be made no later than 31 days after the close of the calendar quarter." 19 C.F.R. § 24.22(g)(5). Under the terms of the statute and regulations, the fee is due and owed to CBP and does not provide that Southwest may keep for itself the fees collected.

Moreover, when the statute uses the phrase "those fees," it plainly refers to the fees collected, and not some "theoretical total" of fees that ought to be collected based upon how many passengers flew and/or were inspected. *See American Airlines, Inc. v. U.S.*, 551 F.3d 1294, 1300 (Fed. Cir. 2008) (analyzing 8 U.S.C. § 1356(f), which governs the immigration fee but is substantially similar in relevant part to 19 U.S.C. § 58c(d), which governs collection and

remittance of the customs inspection fee).  This conclusion finds support not only in the plain language of the statute, but also in the various recordkeeping requirements within the implementing regulations.  *Id.* at 1301 (analyzing the immigration fee recordkeeping provisions).  The latter provides for Government audits and various other enforcement mechanisms to ensure the carriers are properly remitting all the fees collected.  *Id.*  These provisions would have no purpose if the statute simply required carriers to remit fees based solely on the number of passengers transported and inspected.  *Id.*

In its motion, Southwest correctly quotes and explains the *American Airlines* case, but then strains to reach a conclusion opposite from its holding.  Southwest's conclusion is that while *American Airlines* "certainly establishes that collecting a fee is a necessary condition for liability, it cannot reasonably be read to deem an airline liable for all fees it collects, regardless of circumstance …"  Pl's Br. at 12.  There is no support in *American Airlines* for plaintiff's theory.  To the contrary, the fee is "imposed on the users of certain services to cover the cost of providing those services."  *Id.* at 1306.

The statute plainly provides that the airline carrier charge and collect the required customs fee at the time the ticket is issued, and remit those collected fees at any time that is thirty-one (31) days before the close of the quarter.  19 U.S.C. §§ 58c(5)(A), (d)(1)(A), (d)(3).  The fact that Southwest has a "generous" cancellation policy for its so-called "nonrefundable" tickets, in that it permits its customers to cancel their flights up to ten minutes prior to the scheduled departure time in exchange for a nontransferable, expiring travel voucher, is not accounted for by the statute and does not justify the non-remittal of the fees when those vouchers go unused.  Moreover, 19 C.F.R. § 24.22(g)(5), the regulation that deals with the overpayment or underpayment of fees that may be adjusted in the quarterly payment to CBP, does not provide for

a scenario like Southwest's voucher policy.  The statute and regulation should not be read to incorporate a policy devised by Southwest, and the terms of Southwest's Contract of Carriage do not result in a commensurate reduction of the Government's costs for the customs inspection services it provides to Southwest's passengers.  Accordingly, Southwest should not be permitted to retain the customs fee paid by its customers when the fee is statutorily assessed and collected by Southwest for remittance to CBP.

## IV.    CBP's Guidance Explains How Airlines Should Account For Cancelled Tickets

Separate from the statutory authority that provides for the customs inspection fee and does not allow for the collected fee to be retained by Southwest, CBP issued guidance addressing the situation of canceled and unused tickets.  CBP's guidance to the commercial airlines industry advised that "[i]f the airline has already remitted the fees to CBP at the time the purchaser of the unused ticket requests fee refunds, the airline should still refund the fees to the purchaser and deduct the refunded fees from the next quarterly user fee payment due to CBP."  Exhs. A and B. In addition, CBP's letters state that "[t]o the extent user fees are collected on behalf of CBP for unused tickets and such fees are not refunded to purchasers, the user fees are considered to be held in trust for the United States and must still be remitted, without credit, to CBP."  *Id.*  For all of the tickets at issue here, a refund was not provided to Southwest's customers and the collected fees were instead retained by Southwest.

### A.    Southwest Did Not Provide A Refund For The Customs Inspection Fee It Collected On Cancelled Tickets

The CBP letters do not define the term "refund."  While CBP's guidance to the commercial airline industry does not carry the weight of statute or regulation, the Court should consider that when terms are undefined, the definitions of those terms can help to determine their meaning.  *Massachusetts Mut. Life Ins. Co. v. U.S.*, 782 F.3d 1354, 1367 (Fed. Cir. 2015), citing

*Xianli Zhang v. United States*, 640 F.3d 1358, 1364 (Fed. Cir. 2011) ("Dictionary definitions can elucidate the ordinary meaning of statutory terms."); *Am. Express Co.*, 262 F.3d at 1381 n. 5 ("It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation.").

    *Black's Law Dictionary* has defined the term "refund" as "[t]o repay or restore; to return money in restitution or repayment; *e.g.* to refund overpaid taxes; to refund purchase prices of returned goods." *Massachusetts Mut. Life*, 782 F.3d at 1367, quoting *Black's Law Dictionary* 1281 (6th ed. 1990); *see also* REFUND, *Black's Law Dictionary* (12th ed. 2024) ("1. The return of money to a person who overpaid, such as a taxpayer who overestimated tax liability or whose employer withheld too much tax from earnings.  2. The money returned to a person who overpaid.").  Other courts have similarly held that a "refund" is a "[a] repayment; the return of money paid." *McAuliffe v. Vail Corp.*, 69 F.4th 1130, 1147 (10th Cir. 2023), citing *Oxford English Dictionary Online*, https://www.oed.com; *see also* Refund, *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/refund (defining "refund" as "to give or put back" or "to return (money) in restitution, repayment, or balancing of accounts").

    In its brief, Southwest only offers a definition of the word "refund" as the return of money to a person who overpaid.  Pl.'s Br. at 23.  However, in this case, not only did the Government not receive the monies that Southwest was statutorily required to charge and collect from its passengers on the Government's behalf and remit to CBP, but not a single Southwest customer received a refund of their customs inspection fee when they cancelled their ticket.  For all tickets at issue here, Southwest ultimately pocketed the customs inspection fee when the travel voucher expired unused.  That is not a refund.

While CBP's letters to the commercial airline industry are not statutory or even regulatory in nature, they represent the Government's guidance on the appropriate collection and remittance of the customs inspection fee, which is required by law.  To limit the burden of document discovery in this case where no real facts are in dispute and the matter at issue is solely a legal question, the Government agreed not to seek legal deference to CBP's letter in this case.  Letter Agreement of May 18, 2023, ECF 40-11; *see also Loper Bright Enterprises v. Raimondo*, 603 U.S. ___ (2024).  The agency's letters are nevertheless important as a representation of its position on the appropriate handling of the customs inspection fees by the commercial airlines and demonstrates the agency's notice to the commercial airline industry back in 2010.

Southwest acknowledges that it was a member of Airlines for America[1] when the agency sent the letters, and as such receives communications from the industry group.  Rule 30(b)(6) deposition of Ann Gordon Jaycox (August 30, 2023) at 43:11-24.  Ms. Jaycox's testimony as Southwest's Rule 30(b)(6) designee entirely disposes of Southwest's argument that the Government "failed to give Southwest fair notice of Defendant's interpretation that Fee refunds must be given to customers whose tickets are cancelled and that flight credit that later expires unused does not qualify as a refund."  Pl.'s Br. at 10, n.2.

### B.  A Nontransferable, Expiring Travel Voucher Is Not A Monetary Refund

Southwest erroneously contends that issuance of a travel voucher to its customers amounts to a refund.  Pl's Br. at 17.  "It is well-recognized that 'compensation in kind is worth less than cash of the same nominal value.'"  *Ide v. British Airways PLC*, 529 F.Supp.3d 73, 82 (S.D.N.Y. 2021), quoting *In re Mex. Money Transfer*, 267 F.3d 743, 748 (7th Cir. 2001).  Southwest's travel vouchers "cannot be used in anywhere near the same way as cash," because

---

[1]  In 2010, when the agency sent the letters, Airlines for America was known as the Air Transport Association of America.  *See* https://www.airlines.org/who-we-are/history.

they can only be used on Southwest flights for travel by the original ticket purchaser within one year of the date of the original ticket. *See In re Easysaver Rewards Litigation*, 906 F.3d 747, 757 (9th Cir. 2018).  When a Southwest travel voucher expires after one year, the unused value of the voucher effectively "reverts" to Southwest, as Southwest is then under no obligation to make any payment.  In a case involving vouchers that expired after two years, the Ninth Circuit held that arrangements of this kind are reversionary in nature. *See Roes, 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1041 (9th Cir. 2019) ("The dance fee payment vouchers were set to expire in two years, at which time the 'value' of any unredeemed claims ... would revert to the defendant nightclubs.").  Southwest maintains that when a voucher is issued, the customs inspection fee it collected disappears.  Pl.'s Br. at 17.  While Southwest's customers may consent to the reversion of their travel funds to Southwest's coffers on expiration of the voucher, Southwest cannot contract away the customs inspection fee that it is statutorily required to charge and collect on the Government's behalf.

The question here is whether the mere issuance of an expiring, nontransferable travel voucher that is later forfeited, qualifies as a "refund" of the customs inspection fee for Southwest to take a credit on its quarterly remittances to the Government.  The statute does not address such a situation.  The applicable regulations provide that "[o]verpayments and underpayments [of the customs inspection fee] may be accounted for by an explanation with, and adjustment of, the next due quarterly payment to CBP."  19 C.F.R. § 24.22(g)(5).  The regulations do not define "overpayment," but *Black's Law Dictionary* defines it as "[a] payment that is more than the amount owed or due."  PAYMENT, *Black's Law Dictionary* (12th ed. 2024).

Southwest relies on the *United Airlines, Inc. v. U.S.*, 111 F.3d 551 (7th Cir. 1997), for its interpretation of refund, specifically that credits given by an airline to its customers qualify as

refunds.  Pl's Br. at 24-25.  However, the *United Airlines* case is inapposite because the issue in that case was whether there was a reasonable basis in the trial court record to affirm the jury's verdict on the question of "whether on the cancellation of a restricted ticket by a customer, United refunded the full amount of the tax it had collected from the customer so that United should obtain a refund of the full amount of the tax from the government, or whether United refunded only a portion of the tax it had collected from the customer, thereby entitling United to a lesser refund amount."  *United Airlines*, 111 F.3d at 552.  At trial, United Airlines produced evidence to show that its process of immediately netting a penalty from a refund was actually a two-step process of first refunding the full amount of the fare and taxes, thereby entitling it to a refund of all the taxes collected, and then imposing a penalty on the customer.  *Id.* at 554. United Airlines showed that it was a two-step process, including the accounting methods invoked, the special forms used, and the fact that in some instances customers even paid the penalties using a different credit card than the one used to purchase the ticket.  *Id.*  Accordingly, the Seventh Circuit concluded that, given the evidence produced at trial, there was a reasonable basis to support the jury's verdict.  *Id.*

Southwest tries to compare its travel vouchers here to the facts of *United Airlines*, drawing particular attention to the fact that United Airlines' penalty was up to 100% of the fare and taxes, meaning the net transaction yielded provided nothing back to the customer.  *Id.* at 552 ("the penalty for cancelling a restricted ticket was a percentage of the total price of the ticket including the applicable federal excise tax.").  However, Southwest's expiring travel vouchers are materially different from United Airlines' refund and penalty policy.  United Airlines was able to establish that it first provided a cash refund of the taxes, thereby satisfying its legal obligations to provide a refund.  *Id.* at 554.  Only after the refund was accomplished was the

penalty charged.  By contrast, Southwest does not provide monetary refunds for its "nonrefundable" tickets.  Instead, Southwest's expiring, nontransferable travel vouchers, the very thing it considers to be the "refund" here, is "forfeited" under the Contract of Carriage if not used within a year.  When the travel vouchers expired unused, as they did for each ticket at issue here, the customer never received a refund, and thus Southwest should not be permitted to claim a credit on an "overpayment" to CBP.

Here, Southwest did not overpay the customs inspection fees because Southwest owes "those fees" that it collects under color of law from ticket sales to the Government.  19 U.S.C. § 58c(d)(3); *American Airlines*, 551 F.3d at 1300.  The *American Airlines* decision underscores that commercial airline passenger user fees, like the customs inspection fee, are imposed on the passenger and not the carrier.  *See id.*  And, from the customer's perspective, the airline's customers understand that they are paying a Government fee separate from the airfare.  19 U.S.C. § 58c(d)(1)(B); *see* ECF No. 14-1 at ECF page 70 (identifying the "US customs User Fee").  Thus, a customs inspection fee collected from, but not returned to, the customer is still "collected" from the perspective of the airline responsible for remitting the fees.  Therefore, as it concerns Southwest's expired travel vouchers, there has been no "overpayment" to CBP warranting a credit on Southwest's remittances.  Moreover, the agency's 2010 guidance to the commercial airline industry made clear that there is no "overpayment" with respect to the customs inspection fee unless a carrier "refunds" the fee collected from the passenger under color of law back to the passenger.

### C.  The Statutory Customs Inspection Fee Collected By Southwest Is Held In Trust For The Government

By law, commercial airlines are required to charge and collect the customs inspection fee from their customers and to remit those fees to the Government.  Joint Fact Stipulation ¶ 4.  Put

simply, the fee collected is not Southwest's money, and cannot be converted by Southwest to its profit.

In *United States v. McConnell*, 258 B.R. 869, 874 (N.D. Tex. 2001), the trustee of a commercial airline bankruptcy argued that the immigration fee collected by the airline debtor but not remitted to the Government was property of the bankruptcy estate. *McConnell*, 258 B.R. at 874. The court disagreed and concluded that the immigration fee was "held in constructive trust" by the airline under federal common law. *Id.* In reaching this conclusion, the Court observed that the airline "merely acted as a receiving and transmitting agent for the funds." *Id.* The airline's "sole role was to more easily facilitate the collection by the [Government] of passenger inspection fees." *Id.* Although *McConnell's* trust analysis concerned the immigration fee, the statutory and regulatory system for collecting the customs inspection fee is virtually identical.

"Federal common law imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient." *In re Columbia Gas Systems Inc.*, 997 F.2d 1039, 1056 (3rd Cir. 1993), citing *In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (en banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). *Black's Law Dictionary* defines a "constructive trust" as an "equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it." TRUST, *Black's Law Dictionary* (12th ed. 2024); *see also*, Constructive Trust, *Merriam-Webster Dictionary*[2], ("an implied trust imposed by a court to prevent the unjust enrichment of one who has wrongfully obtained (as through fraud or bad faith) title to the property or a property interest of another"). Applied to the facts here, an implied trust operates to prevent

---

[2] Available at, https://www.merriam-webster.com/dictionary/trust#legalDictionary (last visited July 25, 2024).

**PUBLIC VERSION**

Southwest from being unjustly enriched by the customs inspection fees it is statutorily required to collect on behalf of the Government. Southwest has no equitable interest in the inspection fees that it collects from its customers and the fact Southwest commingles the trust funds with its airfare when it issues a travel voucher cannot change the nature of the inspection fees that it collects under color of law.

To establish a constructive trust, courts generally consider four elements: (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment. *Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 257 (S.D.N.Y. 2002). However, courts have noted that the constructive trust doctrine is an equitable remedy and is not rigidly limited by these four elements. *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999).

In *Counihan*, a fire destroyed the subject property after it had been forfeited to the United States in a separate action. *Id.* at 359. The plaintiff then brought an action against the insurer to recover insurance proceeds from the fire. *Id.* at 358. The United States then intervened to assert its entitlement to the benefits of the insurance proceeds in lieu of the property based on a constructive trust theory. *Id.* The Second Circuit held that the four factors sufficiently justified a constructive trust for the Government, affirming that the plaintiff would be unjustly enriched if permitted to keep the insurance policy benefits. *Id.* First, the court held that a fiduciary relationship was present because the Government entrusted Counihan "to retain incidents of ownership" on the property even after the forfeiture judgment was entered. *Id.* at 362. Second, the court held that Counihan "impliedly promised to transfer the insurance proceeds to the government" because she promised to deliver the property through the forfeiture action and the insurance proceeds represented the remains of that property. *Id.* Further, since the Government

was expecting the property through forfeiture, the court held that the third factor, a "transfer in reliance upon a promise," was sufficiently met despite there being no formal transfer of the insurance policy prior to the fire.  *Id.*  Finally, the court noted that "the fourth, and most significant" factor is "unjust enrichment, the deterrence of which is the purpose of a constructive trust."  *Id.*  Accordingly, the court held that to deter unjust enrichment, a constructive trust should be imposed when the holder of legal title should not, in equity, retain the benefits of that title.  *Id.*; *see also, Chisolm v. W. Reserves Oil Co.*, 655 F.2d 94, 97 (6th Cir. 1981) (employing a constructive trust as an equitable remedy to prevent unjust enrichment).

The constructive trust as applied in these cases provides a framework for understanding how customs inspection fees should be treated between the Government and Southwest.  The four elements to guide this Court's analysis on the questions of a constructive trust are (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer made in reliance on that promise; and (4) unjust enrichment.  Here, all four factors are met.

First, a fiduciary relationship exists between the Government and Southwest.  Southwest is required by law to collect the customs inspection fee from its passengers on the Government's behalf.  Second, there is an implied promise between the parties.  Southwest is obligated to remit the customs inspection fees that it collects under color of law to the Government.  When a Southwest travel voucher expires unused, the customs inspection fee that Southwest collected on the Government's behalf is impliedly promised to the Government.  Third, the Government relies on Southwest's implied promise to transfer the inspection fees.  The fees collected under color of law by Southwest fund the salaries, training, and equipment of the customs inspection officers.  Despite there being one fewer passenger to inspect when a ticket is cancelled, the Government's costs do not change commensurately.  CBP officers are still hard at work

**PUBLIC VERSION**

checking travelers as they enter the United States. Permitting Southwest to pocket the customs inspection fee it collects under color of law, which is statutorily designed to cover those governmental costs, would leave the Government with unpaid costs, the customer without a refund, and Southwest with an unjust profit.

Southwest is unjustly enriched when it pockets the customs inspection fees collected on the Government's behalf. In *Counihan*, the court found this factor to be the most significant and held that allowing the plaintiff to retain an insurance payment on a destroyed property that had been forfeited to the Government would clearly constitute an unjust enrichment. Similarly, allowing Southwest to profit from the customs inspection fee that it is statutorily required to collect from its customers in the Government's name, the purpose of which is to provide critical inspection services required to protect the citizens and ports of the United States, is undoubtedly unjust.

**PUBLIC VERSION**

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court grant our cross-motion for summary judgment, deny plaintiff's motion for summary judgment, enter judgment in our favor, and dismiss this action.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

By:    /s/ Aimee Lee
AIMEE LEE
Assistant Director
International Trade Field Office

Of Counsel:          /s/ Guy Eddon
James R. Cohee       GUY EDDON
Senior Attorney       Trial Attorney
Office of the Assistant Chief Counsel,    International Trade Field Office
Indianapolis          Department of Justice, Civil Division
U.S. Customs and Border Protection    Commercial Litigation Branch
                    26 Federal Plaza, Room 346
                    New York, New York 10278
                    (212) 264-9230 or 9236
                    *Attorneys for Defendant*

Dated:  August 13, 2024

**PUBLIC VERSION**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  HON. GARY S. KATZMANN, JUDGE

_____
                               :

SOUTHWEST AIRLINES CO.,       :
                               :
                Plaintiff,    :
                               :
             v.             :    Court No. 22-00141
                               :
UNITED STATES,              :
                               :
                Defendant.  :
_____ :

### <u>CERTIFICATE OF COMPLIANCE</u>

    I, GUY EDDON, a trial attorney in the Office of the Assistant Attorney General, Civil Division, Commercial Litigation Branch, International Trade Field Office, who is responsible for the foregoing memorandum in support of defendant's cross-motion for summary judgment and response in opposition to plaintiff's motion for summary judgment, relying upon the word count feature of the word processing program used to prepare the memorandum, certify that this memorandum complies with type-volume limitation under USCIT Standard Chamber Procedure 2(B) and contains 7,014 words.

                                        <u>/s/ Guy Eddon</u>
                                        Guy Eddon