Slip Op. 25-26

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SOUTHWEST AIRLINES CO.,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES,**<br><br>Defendant. | Before: Gary S. Katzmann, Judge<br>Court No. 22-00141 |

## OPINION

[The court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Cross-Motion for Summary Judgment.]

Dated: <u>March 18, 2025</u>

<u>Adam P. Feinberg</u>, Miller & Chevalier Chartered, of Washington, D.C., argued for Plaintiff Southwest Airlines Co. With him on the briefs was <u>Richard A. Mojica</u>.

<u>Guy Eddon</u>, Trial Counsel, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, N.Y., argued for Defendant United States. With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Amy Lee</u>, Assistant Director. Of counsel in the briefs were <u>James R. Cohee</u>, Senior Attorney, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection, of Indianapolis, IL.

Katzmann, Judge: This case involves the fate of a customs passenger processing fee paid by customers who cancel their airline tickets and never travel at all. Airlines collect the fee from customers at the time of purchase and remit it to U.S. Customs and Border Protection ("CBP") pursuant to 19 U.S.C. § 58c and 19 C.F.R. § 24.22(g). Under 19 U.S.C. § 58c, "the Secretary of the Treasury shall charge and collect the . . . fees . . . for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a)(5)(A). Airlines remit collected fees to CBP on a

quarterly basis. See id. § 58c(d)(3).[1]

Plaintiff Southwest Airlines Co. ("Southwest") is an operator of commercial aircraft. See First Stipulation of Facts ¶ 1, May 22, 2023, ECF No. 29 ("Stipulation of Facts"). During the relevant time period, from July 1, 2014, through June 30, 2017, Southwest offered customers the option to buy "nonrefundable" tickets, for which the customer received a travel credit, called a "Residual Travel Fund" ("RTF"), upon cancellation. See Stipulation of Facts ¶¶ 6, 9; Protest No. 9900-2020-100001 at Ex. 9 § 4(c)(3), June 14, 2022, ECF No. 14-1 ("Contract of Carriage"). RTFs include the amount originally paid as airfare, taxes, and fees, and can be used to purchase future travel on Southwest within one year. See Stipulation of Facts ¶¶ 9–10; Contract of Carriage § 4(c)(3)(ii). During the relevant time period, when a customer used an RTF to purchase a future ticket for international travel, Southwest collected a new fee from the RTF and remitted it to CBP. See Stipulation of Facts ¶ 10; Pl.'s Mot. at 4; Pl.'s Rule 56.3 Statement of Undisputed Material Facts ¶¶ 29–31, Apr. 30, 2024, ECF No. 41-1 ("Pl.'s SUMF"). When a customer did not use an RTF within one year, it expired and Southwest accounted for the amount, including the original fee, as revenue. See Stipulation of Facts ¶ 15; Contract of Carriage § 4(c)(3)(iv). On November 20, 2019, CBP issued a User Fee Audit Report finding that Southwest owed a total of $378.081.76 to CBP. See id. ¶ 18. This amount represents $378,088.26 in underpayment based on the fees from canceled tickets where the RTF expired without being used, minus $6.50 in

---

[1] The statute specifically mentions the Secretary of the Treasury even though CBP is now a component of the Department of Homeland Security. See 6 U.S.C. § 203. However, the Secretary of the Treasury retained regulations concerning user fees, including the fees at issue here, pursuant to Treasury Order No. 100-16. See 6 U.S.C. § 212(a)(1), Treas. Order 100-16 (May 15, 2003). That Order was canceled and superseded on October 30, 2024, by Treasury Order 100-20 delegating the Customs revenue functions to Homeland Security. See 6 U.S.C. § 212(a)(1); Treas. Order 100-20 (Oct. 30, 2024). From July 1, 2014, through June 30, 2017, the relevant time period here, Customs revenue functions fell under the Secretary of the Treasury.

over-remittance associated with an unrelated issue. See id. Southwest paid a total of $444,666.89 to CBP under protest, including the principal amount plus $66,585.13 in interest. See id. ¶¶ 19–20. Southwest now brings this action against Defendant the United States ("the Government"), arguing that CBP illegally exacted this sum from Southwest, see Am. Compl. ¶ 1, July 21, 2022, ECF No. 19.

This case presents a single issue: whether CBP can collect a fee where no passenger arrives in the United States on a commercial aircraft and where CBP provides no customs services. The court concludes that (1) CBP is not entitled to a fee where no passenger travels and CBP provides no customs services and that (2) neither agency guidance nor federal common law empowers CBP to collect a fee where not expressly empowered by Congress. Therefore, the court grants Southwest's Motion for Summary Judgment and denies the Government's Cross-Motion for Summary Judgment.

## BACKGROUND

### I.     Legal Background

Prior to 1986, customs services were largely funded via direct appropriations from Congress. However, in 1986, Congress enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), which established a system of fees to recover a significant portion of expenses related to the provision of customs services. See Pub. L. No. 99–272, 100 Stat. 82 (1986). COBRA provides for a number of different fees to be collected in connection with the arrival of various vehicles, vessels, persons, and merchandise into the United States, including commercial trucks, railroad cars, private and commercial vessels and aircraft, and barges or other bulk carriers. See 19 U.S.C. § 58c(a).

The fee at issue is governed by 19 U.S.C. § 58c, stating that "the Secretary of the Treasury shall charge and collect . . . fees . . . for the provision of customs services in connection with . . .

the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a)(5)(A). The statute includes a "collection" provision, mandating that airlines "shall . . . collect from [customers] the fee . . . at the time the document or ticket is issued," and "shall remit those fees to the Secretary of the Treasury at any time before the date that is 31 days after the close of the calendar quarter in which the fees are collected." Id. § 58c(d)(1)(A), (3). CBP's regulations provide that airlines may account for "overpayments and underpayments" to CBP by adjusting the amount owed on their next quarterly remittance. 19 C.F.R. § 24.22(g)(5). CBP may audit airlines to ensure they are properly remitting all the fees they collect. 8 C.F.R. § 286.5(f).

In 2010, CBP issued two nearly identical Guidance Letters to the airline industry in response to a recommendation from the U.S. Government Accountability Office ("GAO") to clarify ambiguity regarding the refund of fees.[2] See Letter from B. Ingalls, Director of CBP's Revenue Div., to D. Lavin, Reg'l Vice President for N. Am., Int'l Air Transp. Ass'n, Gov't Mot. at Exhibit A (CBP Oct. 28, 2010); Letter from B. Ingalls, Dir. of CBP's Revenue Div., to J. May, President and Chief Exec. Officer, Air Transp. Ass'n of Am., Inc., Gov't Mot. at Exhibit A (CBP Oct. 28, 2010) (collectively the "Guidance Letters"). The Guidance Letters state that fees collected in connection with nonrefundable tickets should be refunded to the customers if a ticket is canceled. See id. The Guidance Letters also state that "[t]o the extent user fees are collected on behalf of CBP for unused tickets and such fees are not refunded to purchasers, the user fees are considered to be held in trust for the United States and must still be remitted, without credit, to CBP." Id.

---

[2] The GAO, often called the "congressional watchdog," investigates how taxpayer dollars are spent to promote government savings and efficiency. About, U.S. GOV'T ACCOUNTABILITY OFF., https://www.gao.gov/about (last visited March 12, 2025).

## II. Factual Background

As has been noted, during the relevant period, Southwest offered its customers the option to purchase either refundable or nonrefundable tickets. See Stipulation of Facts ¶ 9; Contract of Carriage § 4(c). Under Southwest's Contract of Carriage, a customer with a refundable ticket received a refund to the customer's form of payment upon cancellation. See Contract of Carriage § 4(c)(2)(iii). A customer with a nonrefundable ticket received a travel credit, called an RTF, upon cancellation. See Stipulation of Facts ¶ 9; Contract of Carriage § 4(c)(3)(ii). These travel credits included the amounts originally paid as airfare, taxes, and fees (including the fee at issue) and could be used to purchase future travel on Southwest, again including the airfare, taxes, and fees. See Stipulation of Facts ¶¶ 9–10; Contract of Carriage § 4(c)(3)(ii). If a customer used an RTF to purchase future travel on an international flight, Southwest collected a new fee from the RTF and remitted it to CBP. See Stipulation of Facts ¶ 10. If a customer did not use an RTF within a year from the date the canceled ticket was purchased, the RTF expired, and Southwest accounted for the funds, including the fee, as revenue.[3] See Stipulation of Facts ¶¶ 10, 15; Contract of Carriage § 4(c)(3)(ii), (iv).

In September 2017, CBP audited Southwest's fee compliance covering the period from July 1, 2014, through June 30, 2017. See Stipulation of Facts ¶¶ 5–6. The Government reviewed a sample of one hundred canceled "nonrefundable" tickets, including eighty-eight for which Southwest issued an RTF. See id. ¶¶ 8–9. For the remaining twelve of the one hundred tickets in the sample, Southwest refunded the entire fare for the ticket to the purchaser's credit card. See id. ¶ 11. When a ticket in the sample was canceled and Southwest had previously remitted the fee

---

[3] Southwest subsequently changed its policy so that RTFs are valid indefinitely. See Pl.'s SUMF ¶ 10.

amount to CBP, Southwest claimed a credit for the amount of the fee on a future fee remittance to CBP, regardless of whether Southwest refunded the amount to the purchaser's credit card or issued an RTF. See id. ¶ 14. If Southwest had not already remitted the amount of the fee, Southwest did not include such amount in future fee remittances. See id. Twenty-one RTFs of the eighty-eight issued for canceled tickets in the sample eventually expired, having not been used within a year. See id. ¶ 12. For those twenty-one canceled tickets for which RTFs were issued and eventually expired, Southwest retained the funds the customer originally paid, including the fee, and accounted for the total amount as revenue. See id. ¶ 15.

On November 12, 2019, CBP issued a User Fee Audit Report. See id. ¶ 7. CBP found that the twenty-one canceled tickets for which RTFs were issued and eventually expired were "errors" because they involved instances where no refund was provided to the customer and the passenger did not use the RTF. See id. ¶ 16. CBP did not identify as "errors" any of the remaining tickets in the sample, where Southwest either refunded the amount to the customer's credit card or where the customer used the RTF before it expired. See id. CBP extrapolated the twenty-one "errors" to compute an underpayment of $378,118.13 for all "errors" during the period between July 1, 2014, and June 30, 2017. See id. ¶¶ 6, 16. On November 20, 2019, CBP issued a liability assessment against Southwest based on the audit, claiming that Southwest owed $378,081.76 to CBP. See id. ¶ 18. This amount represents the $378,088.26 underpayment associated with the "errors" minus a separate $6.50 over-remittance associated with an unrelated issue. See id.

On January 6, 2020, Southwest paid the $378,081.76 to CBP under protest. See id. ¶ 19; Protest No. 9900-2020-100001 at Ex. 2, June 14, 2022, ECF No. 14-1. On March 4, 2020, Southwest paid an additional $66,585.13 in interest on the original amount, also under protest. See Stipulation of Facts ¶ 21; Protest No. 9900-2020-100001 at Ex. 4, June 14, 2022, ECF No. 14-1.

CBP denied the protest on November 9, 2021.  See Stipulation of Facts ¶ 24, Protest No. 9900-2020-100001 at 132, June 14, 2022, ECF No. 14-1.

### III. *Procedural History*

Southwest brought this action against the Government on May 6, 2022 for the recovery of the sums based on CBP's statutory and regulatory authority relating to the customs passenger processing fee.  See Corrected Compl., May 10, 2022, ECF No. 11; 19 U.S.C. § 58c(a)(5)(A); 19 C.F.R. § 24.22(g).  The Government filed an answer on August 26, 2022.  See Answer to Am. Compl., Aug. 26, 2022, ECF No. 20.  Southwest filed a Motion for Summary Judgment on April 30, 2024, see Pl.'s Mot. for Summ. J., Apr. 30, 2024, ECF No. 40 ("Pl.'s Mot."), and the Government responded with a cross-motion for summary judgment and response, see Def.'s Cross Mot. for Summ. J. and Resp. in Opp'n to Pl.'s Mot. for Summ. J., Aug. 13, 2024, ECF No. 47 ("Gov't Mot.").  Southwest filed its response on August 30, 2024, see Resp. in Opp'n to Cross-Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J., Aug. 30, 2024, ECF No. 49 ("Pl.'s Resp."), and the Government filed its reply on October 24, 2024, see Reply in Supp. of Def.'s Cross-Mot. for Summ. J., Oct. 24, 2024, ECF No. 54 ("Gov't Reply").

With all papers filed, the court held oral argument on November 21, 2024.  See Order, Oct. 30, 2024, ECF No. 55; Tr. of Oral Arg., Dec. 6, 2024, ECF No. 64.  Prior to oral argument, the court issued, and the parties responded to, questions regarding the case.  See Letter re: Qs. for Oral Arg., Nov. 5, 2024, ECF No. 56; Def.'s Resp. to Ct.'s Qs., Nov. 15, 2024, ECF No. 58; Pl.'s Resp. to Ct.'s Qs., Nov. 15, 2024, ECF No. 59.  The court issued supplemental questions before oral argument on November 21.  See Letter re: Suppl. Qs. for Oral Arg., Nov. 20, 2024, ECF No. 60. As directed by the court, the parties filed briefs following oral argument.  See Pl.'s Post-Arg. Submission, Dec. 4, 2024, ECF No. 62; Def.'s Post-Arg. Submission, Dec. 4, 2024, ECF No. 63.

## JURISDICTION AND STANDARD OF REVIEW

Under 28 U.S.C. § 1581(a), this court has "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." Section 515 of the Tariff Act of 1930, codified at 19 U.S.C. § 1515, covers protests commenced under section 514 of the same title regarding "the legality of . . . all charges or exactions of whatever character within the jurisdiction of the Secretary of the Treasury." 19 U.S.C. § 1514(a).

Under 28 U.S.C. § 2640, the court "shall make its determinations upon the basis of the record made before the court" in cases contesting the denial of a protest under § 515 of the Tariff Act of 1930. 28 U.S.C. § 2640(a). This amounts to a de novo standard. See Ford Motor Co. v. United States, 811 F.3d 1371, 1379 (Fed. Cir. 2016). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In evaluating a motion for summary judgment, "the evidence of the non-movant is to be believed and all justifiable inferences are drawn in favor of the non-movant . . . . This standard is not changed when the parties bring cross-motions for summary judgment, each nonmovant receiving the benefit of favorable inferences." Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M., 281 F.3d 1249, 1252–53 (Fed. Cir. 2002) (citation omitted).

## DISCUSSION

Southwest argues that CBP is not entitled to a fee when a ticket is canceled based on the plain language of the statute and the regulation connecting the fee to the "provision of customs services" and the "arrival of each passenger aboard a . . . commercial aircraft." Pl.'s Mot. at 10 (quoting 19 U.S.C. § 58c(a)). The Government contends that CBP is entitled to a fee when a ticket

is issued regardless of whether it is later canceled. See Gov't Mot. at 11–14. The Government also points to the plain text of the statute stating that carriers "shall collect" the fee "at the time the . . . ticket is issued." Gov't Mot. at 11 (emphasis omitted) (quoting 19 U.S.C. § 58c(d)(1)(A)).

The Government suggests that the Guidance Letters explain that airlines should account for canceled tickets by refunding the collected funds back to the customer. See Gov't Mot. at 14. According to the Government, Southwest failed to provide a refund because the value of an RTF, including the funds collected as a fee, reverts to Southwest upon expiration. See Gov't Mot. at 17. Southwest argues that neither the statute nor the regulation provides that a refund is the only way a fee can become "uncollected." Pl.'s Resp. at 11–13; see also Pl.'s Mot at 18. According to Southwest, the fee "lose[s] its character" as a fee when a ticket is canceled in exchange for an RTF regardless of whether the RTF is a refund. Pl.'s Mot. at 17. In any event, Southwest contends, an RTF is a proper refund because a travel credit qualifies as a refund. See Pl.'s Mot. at 23–28.

Finally, the Government suggests that the collected fees are held in trust by Southwest for the Government because the airline "merely act[s] as a receiving and transmitting agent for the funds." Gov't Mot. at 20 (quoting United States v. McConnell, 258 B.R. 869, 874 (N.D. Tex. 2001)). Southwest contends that the Government's trust theory is meritless because CBP has no equitable interest where tickets are canceled. See Pl.'s Mot. at 15. A trust cannot, according to Southwest, override the statute and regulation to create CBP's entitlement to funds where no such entitlement exists. See id. at 14.

Southwest also suggests that the Government did not show the lack of a factual dispute as to whether Southwest actually received the Guidance Letters. See Pl.'s Resp. at 28. Thus, Southwest argues, CBP did not give Southwest "fair notice of [its] interpretations." Id. at 29. The Government contends that "it makes little difference whether Southwest received" the Guidance

Letters because "the Government does not seek any deference" to them. Gov't Reply at 12. However, the Government suggests the letters are still entitled to "respect as guidance to the commercial airline industry." Id.

> **I.    CBP Is Not Entitled to a Fee Where No Passenger Arrives to the United States and Where CBP Provides No Customs Services.**

Recall that the fee at issue is governed by 19 U.S.C. § 58c, stating that "the Secretary of the Treasury shall charge and collect . . . fees . . . for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a).

The Government argues that Southwest is statutorily required to collect and remit the customs inspection fee. See Gov't Mot. at 11. As summarized above, the Government points to the term "shall" within the statute, specifically noting that the statute states that commercial carriers "shall collect" the fee "at the time the ticket is issued" and "shall remit those fees" to CBP. Id. at 11 (quoting 19 U.S.C. § 58c(d)(1)(A), (3)). According to the Government, this language leaves carriers with no option but to collect the fee when the ticket is sold and remit the collected funds to CBP. See id. Southwest contends that the language of "[t]he statute is clear that the [f]ee applies only when a passenger actually travels on a plane," such that "CBP has no authority to 'charge and collect' fees in connection with" customers who cancel their ticket. Pl.'s Mot. at 10–11. Southwest highlights that the "[f]ees may be charged . . . only with respect to customs services rendered in regard to arriving passengers," arguing that no customs services are rendered in regard to canceled tickets. Id. at 11–12.

"In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427, 436 (2019) (quoting Schindler Elevator Corp. v. United States ex rel.

Kirk, 563 U.S. 401, 407 (2011)). Courts must construe statutes, not isolated provisions by "read[ing] the words Congress enacted in their context and with a view to their place in the overall statutory scheme." Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 275 (2023) (internal quotation marks and citation omitted). Additionally, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 410 (2024).

The statute empowers CBP to collect fees "for the provision of customs services in connection with the following: . . . for the arrival of each passenger aboard a commercial vessel or commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a). Based on this language, CBP is only entitled to a fee for the provision of customs services in connection with the arrival of a passenger. Where a customer cancels their ticket, there is no arriving passenger, CBP provides no customs services, and thus CBP is not entitled to a fee.

The Government points to the statute's "collection" provision, mandating that airlines "that issue[] a document or ticket to an individual for transportation . . . shall collect from that individual the fee charged under subsection (a)(5) at the time the document or ticket is issued." Gov't Mot. at 3 (quoting 19 U.S.C. § 58c(d)(1)). The "collection" provision also provides that airlines "who collects fees under paragraph (1) or (2) shall remit those fees to the Secretary of the Treasury." Id. at 3 (quoting 19 U.S.C. § 58c(d)(3)); see also id. at 11. The Government contends that this provision entitles CBP to the fee when it is collected, rather than upon the arrival of the passenger. See id. at 12. However, while the terms "shall remit those fees," on their own imply that Southwest must remit any funds it collects, this interpretation does not reflect "the words Congress enacted in their context and with a view to their place in the overall statutory scheme." Turkiye Halk Bankasi, 598 U.S. at 275 (emphasis added) (internal quotation marks and citations omitted).

The statute as a whole provides that CBP is entitled to the fee based on the provision of customs services in connection with the arrival of a passenger, not upon the carrier's collection of the funds. The statute introduces the fee as "for the provision of customs services in connection with . . . the arrival of each passenger," 19 U.S.C. § 58c(a)(5)(A), and multiple other parts of the statute refer to this introductory provision. For example, one provision states that "the customs services required to be provided to passengers upon arrival in the United States shall be adequately provided in connection with scheduled airline flights at customs serviced airports when needed and <u>at no cost (other than the fees imposed under subsection (a)) to airlines and airline passengers</u>." 19 U.S.C. § 58c(e)(1)(A) (emphasis added). Similarly, 19 U.S.C. § 58c(e)(6) states that "during any period when fees are authorized under subsection (a), no charges, other than such fees, may be collected" by CBP. These provisions note that CBP is entitled to the fees described in § 58c(a), not the amounts the airline collects under § 58c(d). Yet another provision notes that "[f]ees may be charged under subsection (a)(5) <u>only with respect to customs services rendered in regard to arriving passengers using transportation</u> for which documents or tickets were issued after the date that is 90 days after April 7, 1986." <u>Id.</u> § 58c(j)(2) (emphasis added). Though this provision relates to the effective date, its language refers to 58c(a) and is consistent with the interpretation that CBP is only entitled to a fee for the provision of customs services in connection with arriving passengers. The language throughout the rest of the statute continuously refers to the fees in connection with the arrival of a passenger. <u>See, e.g.</u>, <u>id.</u> § 58c(a)(5)(A), (b)(1)(A)(i), (b)(4)(A).

In contrast, an interpretation of this provision that would entitle CBP to funds based on collection alone relies on a single, isolated provision within the statute. The text upon which the Government relies appears in a "collection" provision describing the general process for collection and remittance and does not dictate whether CBP is entitled to the funds. This provision cannot

be read in isolation to suggest that CBP's entitlement to the fee is based entirely on the mere collection of the funds when the rest of the statute continuously connects the fee to the customs services rendered in connection with the arrival of each passenger. Id. § 58c(a)(5)(A); see also Turkiye Halk Bankasi, 598 U.S. at 275 (describing a "duty to construe statutes, not isolated provisions." (quoting Graham Cnty. Soil and Water Conservation Dist. v. United States ex rel. Wilson, 559 U.S. 280, 290 (2010))).

The Government's interpretation of the statute as entitling CBP to a fee whenever a ticket is issued also contradicts CBP's actions during the audit and the Government's own arguments related to refunds. Recall that CBP only identified the tickets for which RTFs expired as "error" tickets, and only calculated an underpayment associated with these "error" tickets. See Stipulation of Facts at ¶ 16. CBP did not identify canceled tickets for which RTFs were issued and later used as "error" tickets and did not calculate an underpayment associated with these canceled tickets. However, the Government's interpretation of the statutory language suggests that CBP would be entitled to a fee regardless of whether the carrier issues a refund because each carrier "shall collect" a fee "at the time the document or ticket is issued," and "shall remit those fees." 19 U.S.C. § 58c(d)(1), (3). Therefore, the Government's argument that CBP's entitlement to the fees is connected to their collection contradicts CBP's identification of only tickets for which RTFs expired as "error" tickets. Southwest's interpretation of the statute and regulation—that CBP's entitlement to the fees is connected to the arrival of passengers into the United States and the provision of customs services—is consistent with CBP's actions during the audit.

The Government separately argues that Southwest should have refunded the fee to the purchaser and that an RTF does not qualify as a refund. See Gov't Mot. at 14. This argument suggests that CBP is not entitled to a fee where the carrier refunds the funds to the customer and

is therefore also inconsistent with the Government's argument here that CBP's entitlement to the fees is connected to their collection.

> II. **Neither the Guidance Letters Nor Federal Common Law Empower CBP to Collect Fees Where No Passenger Travels.**

Recall that the Guidance Letters, which CBP issued in response to GAO's recommendation to provide airlines clarity regarding canceled tickets, state that where the airline has already remitted the fee to CBP, "the airline should still refund the fees to the purchaser and deduct the refunded fees from the next quarterly user fee payment due to CBP," and that where "fees are not refunded to purchasers, the user fees are considered to be held in trust for the United States and must still be remitted." Guidance Letters.

The Government points to the Guidance Letters to argue that Southwest was obligated to refund the fees to the customers upon cancellation of a ticket, that an RTF is not a refund, and that any fees not refunded are held in trust for the United States. See Gov't Mot. at 14–23. Southwest argues that the Guidance Letters "carr[y] no weight in connection with any statutory or regulatory interpretation questions" and that CBP failed to show that Southwest received the Guidance Letters before the audit. Pl.'s Resp. at 27–28.

"Where Congress has established a clear line, the agency cannot go beyond it." City of Arlington v. FCC, 569 U.S. 290, 307 (2013). "It is indeed well established that the absence of a statutory prohibition cannot be the source of agency authority." FAG Italia S.p.A. v. United States, 291 F.3d 806, 816 (Fed. Cir. 2002). Where Congress established a clear line within the relevant statute—empowering CBP to collect fees for the provision of customs services in connection with arriving passengers—the Guidance Letters cannot empower CBP to collect fees where no customs services are provided and no passenger arrives.

### A. The Guidance Letters Do Not Obligate Southwest to Refund Funds Collected as Fees to the Customers or Else Remit Them to CBP.

Neither the statute nor its implementing regulations suggest that carriers must remit funds collected as fees even where a passenger does not travel and where CBP provides no customs services. The statute instead empowers CBP to "charge and collect the . . . fees . . . for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States." 19 U.S.C. § 58c(a)(5)(A). Absent statutory authority, CBP cannot collect funds where no passenger travels and where CBP provides no customs services. The absence of any provision speaking to the disposition of funds collected as fees upon ticket cancellation cannot be the source of CBP's authority to dictate what carriers do with those funds. Where CBP is not empowered to collect a fee, carriers are free to deal with the disposition of a canceled ticket, including the funds collected as fees, as a matter of contract between the carrier and the customer. The Government argues that "Southwest cannot contract away the customs inspection fee that it is statutorily required to charge and collect on the Government's behalf." Gov't Mot. at 17. While Southwest may not be able to contract away a fee that CBP is statutorily entitled to, CBP has no entitlement to the funds at issue here.

The Government suggests that the Guidance Letters are "important as a representation of [CBP's] position on the appropriate handling of the customs inspection fees by the commercial airlines." Id. However, the Government also "agreed not to seek legal deference [to the Guidance Letters] in this case." Id. at 16. While the Government suggests that the Guidance Letters are "entitled to respect as guidance to the commercial airline industry," Gov't Reply at 12, the Government also states that "it makes little difference whether Southwest" even received the letters. Id. Regardless of whether Southwest ever received the Guidance Letters, the Guidance

Letters cannot be read to independently grant CBP the authority to collect customs inspection fees where no passenger travels and CBP provides no customs services.

The Government argues, as summarized above, that Southwest must remit any fees that are collected and not refunded. See Gov't Mot. at 14. Because the RTFs expire, according to the Government, their value reverts to Southwest and cannot be considered a refund. See id. at 16–17. However, as indicated above, CBP has no authority to dictate what carriers do with funds collected when no passenger travels and CBP provides no customs services. Therefore, the court need not decide whether RTFs qualify as refunds.

> **B.     Southwest Does Not Hold Funds Collected as Fees in a Constructive Trust for CBP Because CBP Has No Equitable Interest in a Fee Where No Passenger Travels.**

Recall that the Government argues that the funds collected by Southwest as fees are held in a constructive trust for the Government. The Government maintains that the Guidance Letters explain how airlines should handle canceled tickets, id. at 14, noting language stating that where "fees are not refunded to purchasers, [they] are considered to be held in trust for the United States," Guidance Letters. The Government also contends that Southwest acts as a collection agent for the Government such that Southwest holds the funds in constructive trust on behalf of the Government. See Gov't Mot. at 19–22. Under this trust theory, the Government is the beneficiary of the fees collected by the collection agent, Southwest, precluding Southwest's entitlement to judgment as a matter of law based on its allegation that the Government "illegally exacted from Southwest," the fees at issue. Am. Compl. ¶ 2. Southwest again notes that the Government waived any deference to the Guidance letters and contends that CBP has no equitable interest in the funds where no passenger travels and so is not the true beneficiary of the funds. See Pl.'s Mot. at 15. Even if a trust could exist as to the fee, according to Southwest, "it could not override the statute and

regulation so as to create CBP's entitlement to funds where no such entitlement otherwise exists." Id. at 14.

A "constructive trust" is an "equitable remedy by which a court recognizes that a claimant has a better right to certain property than the person who has legal title to it." Trust, Black's Law Dictionary (12th ed. 2024); see also In re Columbia Gas Sys. Inc, 997 F.2d 1039, 1059 (3d Cir. 1993) ("[T]he classic definition of a trust [is that] the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee."). Thus, a constructive trust is based upon a theory of unjust enrichment, where a person acquires property "at the expense of the claimant or in violation of the claimant's rights." Restatement (Third) of Restitution and Unjust Enrichment § 55(1) (Am. L. Inst. 2011). Federal common law "imposes a trust when an entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient." Columbia Gas Sys., 997 F.2d at 1056 (citations omitted).

COBRA set up a system where carriers collect money from customers and forward it to CBP, such that carriers like Southwest act as a conduit. See 19 U.S.C. § 58c. The Government argues that this relationship is enough to establish a constructive trust between Southwest and the Government. See Gov't Mot. at 20 (citing Columbia Gas Sys., 997 F.2d at 1056). However, this argument ignores the fundamental purpose of a constructive trust: to remedy unjust enrichment. See, e.g., Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999) (explaining that a constructive trust is designed to "prevent unjust enrichment."). In this case, Southwest did not acquire the funds "at the expense of the [Government] or in violation of [the Government's] rights." Restatement (Third) of Restitution and Unjust Enrichment § 55(1). Indeed, the Government has no interest in funds that CBP is not empowered to collect—funds collected from

customers who do travel or receive customs services. See supra Section I.[4]

Most of the cases the Government cites involve beneficiaries who had a clear equitable interest in the property at issue, and thus, the courts did not consider whether the defendants acquired the property at the expense of the claimants. For example, the relevant question in United States v. McConnell was whether the collector of the fees—the defendant—had an equitable interest such that the fees were property of the collector's estate for the purposes of a bankruptcy proceeding. 258 B.R. 869, 871–72 (N.D. Tex. 2001). However, regardless of whether a claimant has an equitable interest to property, a party does not hold property in trust for a beneficiary where that claimed beneficiary has no interest in the property. See Columbia Gas Sys., 997 F.2d at 1059 ("[T]he classic definition of a trust [is that] the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee."). While McConnell involved a substantially similar fee—one collected from passengers arriving in the United States for the purpose of conducting immigration inspections—the court there had no reason to consider whether the United States—the claimant—had an interest in the funds collected as fees.

In contrast, the U.S. Court of Appeals for the Second Circuit (the "Second Circuit") in Counihan considered whether the claimant had an equitable interest in the property and whether the defendant was unjustly enriched at the claimant's expense. See 194 F.3d at 358. In Counihan, the United States asserted that it was entitled to the benefits of a fire insurance policy under a theory of constructive trust based on forfeiture proceedings. See id. There, the Second Circuit found that "[a] constructive trust is properly imposed in this situation in order to make the

---

[4] As Southwest notes, whether federal common law imposes a constructive trust with Southwest's customers as the beneficiary is not a question before the court. See Pl.'s Mot. at 15 n.6. It is therefore irrelevant whether the customers have an equitable interest in, or even a better right than Southwest to, the funds collected as fees.

government whole for its loss." Id. at 361.  In contrast, here, CBP is not entitled to a fee where no passenger travels, and so remittance would not "make the government whole." [5] Id.

Neither the Guidance Letters nor federal common law can create a trust where CBP is not entitled to the funds in the first place.[6]  The statutory and regulatory language here only empowers CBP to "collect . . . fees . . . for the provision of customs services in connection with . . . the arrival of each passenger aboard a . . . commercial aircraft from a place outside the United States."  19 U.S.C. § 58c(a)(5)(A).  Therefore, CBP is not entitled to any fee where no passenger arrives and where no customs services are provided.  Where CBP is not entitled to a fee, it is irrelevant whether Southwest refunds the funds collected as fees upon cancellation of a ticket, and the Government cannot claim to be the beneficiary of a constructive trust based on Southwest's unjust enrichment.

Ultimately, the plain language of the statute and the regulation indicate that CBP is entitled to a fee for the provision of customs services in connection with the arrival of a passenger into the United States.  Therefore, CBP is not entitled to a fee where no passenger arrives into the United States and where CBP provides no customs services.  Because the statute does not provide CBP the authority to collect the fees at issue here, Southwest is free to treat the disposition of a canceled

---

[5] The Government suggests in its Reply that the customers have the greatest equitable interest in the fees.  See Gov't Reply at 3 ("[T]hese fees were properly collected by Southwest and should have been returned to the customer when the customer does not use the purchased ticket.").  Even assuming some force to that observation, the question posed here for decision is not whether the customers have a right to the funds collected as fees when they do not travel.  The question before the court is whether the statute and regulation authorize CBP to collect a fee where no customer travels.  Therefore, any equitable interest the customers may have to the funds at issue is not relevant to the case before the court, no matter how great that interest may be.

[6] To the extent the Government invokes the Guidance Letters to argue that an express trust exists as to the fees at issue, this argument is irrelevant.  As indicated above, supra Section II.A, the Government "agreed not to seek legal deference [to the Guidance Letters] in this case."  Gov't Mot. at 16.  Additionally, the Government has no interest in the funds collected as fees when no passenger arrives and CBP provides no customs services, and the Guidance Letters cannot independently grant CBP the authority to collect those fees.  See supra Section II.A.

ticket, including the funds collected as fees, as a matter of contract with its customers. The court, therefore, need not determine whether the RTFs qualify as refunds. Additionally, because CBP is not entitled to the fees at issue here, the Government is not the beneficiary of a constructive trust containing the fees Southwest collects.

## CONCLUSION

For the reasons stated above, Southwest's motion for summary judgment is granted and the Government's cross-motion for summary judgment is denied. The court "may enter a money judgment" under 28 U.S.C. § 2643. The court will enter judgment accordingly in Southwest's favor against the Government in the amount of $444,673.39 plus any interest provided for by law.

**SO ORDERED.**

/s/     *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: March 18, 2025
New York, New York